#### IN THE UNITED STATES DISTRICT COURT FOR THE
#### EASTERN DISTRICT OF OKLAHOMA

**UNITED STATES OF AMERICA,**

*Plaintiff,*

v.

**HENRI PIETTE,**

*Defendant.*

Case No. CR-17-079-RAW

### GOVERNMENT'S RESPONSE AND OBJECTION
### TO DEFENDANT'S MOTION IN LIMINE
### RE: EXPERT TESTIMONY OF DR. JOANN BEHRMAN-LIPPERT

COMES NOW, the United States of America, by and through United States Attorney Brian J. Kuester, and Assistant United States Attorneys Edward Snow and Sarah McAmis, and hereby submits this Response and Objection to Defendant's Motion in Limine Re: Expert Testimony of Dr. Joann Behrman-Lippert.

### STATEMENT OF THE CASE

On December 13, 2017, the Defendant was charged by way of Indictment with one count of Kidnapping in violation of 18 U.S.C. §§ 1201(a)(1) & 1201(g), and one count of Travel with Intent to Engage in Sexual Act with a Juvenile in violation of 18 U.S.C. § 2423(b). The Defendant made his initial appearance and was arraigned on January 16, 2018. The Defendant subsequently waived his right to a Speedy Trial (Doc. 21) and the case was declared Complex (Doc. 23). A jury trial is currently scheduled to begin on May 29, 2019. On May 14, 2019, the Defendant filed a Motion in Limine Re: Expert Testimony and Request for a *Daubert/Kumho* Hearing. (Doc. 145).

The Court directed the Government to file an Expedited Response (Doc. 146) and set the matter for Hearing on May 23, 2019 at 1:00 p.m. (Doc. 147).[1]

## STATEMENT OF FACTS RELEVANT TO THIS MOTION

The victim in the case at bar is now an adult. However, the time frames alleged in the Indictment began when she was a young child. The Government alleges that the Defendant kidnapped the victim and began sexually abusing her when she was approximately 11-years-old. The Defendant incorporated physical abuse and psychological control as a part of the sexual abuse. The victim was approximately 12-years-old when she first became pregnant with the Defendant's baby. Unfortunately, she suffered a miscarriage. In the years that followed, the Defendant continued to sexually abuse the victim on a near daily basis.

When she was 15-years-old, the victim again became pregnant by the Defendant. Her first living child, E.P., was born on April 23, 2000. The Defendant continued to keep the victim captive for years after and, during that time, the victim delivered eight (8) more babies by the Defendant. M.P. was born June 25, 2001, I.P. was born October 21, 2003, A.P. was born April 14, 2005, R.W.P. was born April 25, 2006, R.L.P. was born January 12, 2008, H.P. was born May 25, 2011, S.P. was born November 12, 2012, and T.R. was born October 1, 2014. It was not until 2016 that the victim and her children were finally able to escape the Defendant's control.

In preparation for jury trial, the Government retained an expert, Dr. Joann Behrman-Lippert, Ph.D. Dr. Lippert is a licensed Clinical Psychologist. She has previously offered expert testimony on issues related to the dynamics of child sexual abuse and domestic violence. Dr.

---

[1] On that same date and time, there are numerous pre-trial issues to be resolved. Dr. Lippert resides out-of-state. If necessary, the parties have agreed that it would be acceptable to hold the hearing, wherein Dr. Lippert's testimony is heard and considered out-of-the-presence of the jury, either on a different date before trial or during a short recess in the trial.

Lippert prepared a report and it was provided to the Defendant on April 29, 2019 and at Bates 1275-1305.

## ARGUMENT

Cases which involve the sexual abuse of children are fundamentally different from most any other criminal case. The dynamics involved include everything from the secrecy and shame associated with sexual abuse, to the difficulties that children have in disclosing the abuse, to the nature of the family relationships. Similar to cases which involve domestic violence wherein lay persons often do not understand why a victim would stay with her abuser, lay persons also have many misconceptions about why sexual abuse victims do not immediately disclose, fight back, or run away. It is for that reason that the Government seeks to present expert testimony through Dr. Lippert.

In the Defendant's Motion in Limine, he essentially asks this Court to enter an Order prohibiting Dr. Lippert from diagnosing the victim as a victim of abuse and prohibiting her from commenting on the victim's credibility or vouching for the victim's truthfulness. To be clear, the Government agrees with the Defendant's concerns and will not use Dr. Lippert for either of those purposes. Specifically, the Government will NOT ask Dr. Lippert to make a diagnosis of the victim nor will the Government ask her any questions regarding the victim's credibility or truthfulness. The Government agrees that such questions would be improper. Instead, the Government will ask Dr. Lippert, based upon her education, training, background, and experience, to explain the general dynamics of 1) child sexual abuse, 2) child sexual abuse accommodation syndrome, 3) domestic violence, and 4) the captivity stress, trauma, and loss associated with these conditions.

Although not binding on this Court, in *Davenport v. State of Oklahoma*, 806 P.2d 655 (Okl.Cr. 1991), the Oklahoma Court of Criminal Appeals conducted an extensive analysis of the

3

type of testimony that the Government is seeking to admit herein.[2] In *Davenport*, the State called a psychologist as a witness to give expert testimony describing the behavioral patterns of sexually abused children, known as Child Sexual Abuse Accommodation Syndrome (CSAAS). *Id.* at 658. The psychologist only explained the patterns and did not testify about the particular child in the case. *Id.*

The Court stated that it had "the right to make an independent search of appropriate medical and legal doctrines to determine if the syndrome is generally accepted." *Id.* Having done so, the Court found:

> [I]t is a generally accepted doctrine. A complete in-depth discussion of the accommodation syndrome from the legal as well as medical perspective (written by one lawyer, two doctors and two psychologists) is found in a recent Law Review article. *Expert testimony in Child Sexual Abuse Litigation,* 68 Nebraska Law Review 1 (1989). *Id.*

The Court went on to find:

> The syndrome was first assembled through the research of Roland C. Summit, M.D., whose specialty is in community consultation to diverse clinical and para-clinical sexual abuse programs. The research is entitled "The Child Sexual Abuse Accommodation Syndrome", *Child Abuse and Neglect,* Vol. 7, pp. 177–193, (1983). The doctor starts with secrecy (1) and quotes from individual cases such as "This is our secret; nobody else will understand", "don't tell anybody", "nobody will believe you", "don't tell your mother, she will hate you, she will kill you, kill me, send you away, etc." The doctor ends with the "retraction" stage (5). This stage explains why a child recants. His findings show that the child is often abandoned by a father, the father calls the child a liar, the mother then does not believe the child, further, the mother suffers from hysteria and rage, the family is fragmented and the child may be placed in custody. He goes on to show that the father or stepfather

---

[2] As seen below, the Court's analysis is instructive because it relies on the same study subsequently cited in numerous Federal Court opinions.

4

is threatened with disgrace and imprisonment and that the child is blamed for "the whole mess". The mother starts on the child by statements such as "why do you insist on telling those awful stories about father?", "If we send him to prison, we won't be a family anymore." Doctor Summit's research has been widely quoted by other experts in the field. A sample of this would be from another article entitled "Breaking Secrecy", *Psychiatric Clinics of North America,* Vols. 12(2), 337–349, (1989). Through our independent research, we find the syndrome to be valid and without medical dissent.

Numerous courts have allowed an expert to testify in rebuttal to explain delay in reporting as well as why a child recants. As to delay, *see Bostic v. State,* 772 P.2d 1089 (Alaska Ct.App.1989); *People v. Bowker,* 203 Cal.App.3d 385, 249 Cal.Rptr. 886 (1988); *People v. Hampton,* 746 P.2d 947 (Colo.1987); *Wheat v. State,* 527 A.2d 269 (Del.1987); *Griego v. State,* 761 P.2d 973 (Wyo.1988). As to recanting, *see State v. Lindsey,* 149 Ariz. 472, 720 P.2d 73 (1986); *People v. Luna,* 204 Cal.App.3d 726, 250 Cal.Rptr. 878 (1988); *People v. Bowker, supra; Wheat v. State, supra; State v. Middleton,* 294 Or. 427, 657 P.2d 1215 (1983); *Commonwealth v. Baldwin,* 348 Pa.Super. 368, 502 A.2d 253 (1985); *State v. Madison,* 53 Wash.App. 754, 770 P.2d 662 (1989).

Furthermore, many jurisdictions have allowed expert testimony describing the reactions of typical child victims of sexual abuse if it will assist the jury in deciding whether or not the alleged abuse occurred. *See People v. Deninger,* 772 P.2d 674, 676 (Colo.App.1989); *State v. Reser,* 244 Kan. 306, 767 P.2d 1277, 1279 (1989); *Griego v. State,* 761 P.2d 973, 979 (Wyo.1988); *Townsend v. State,* 103 Nev. 113, 734 P.2d 705, 708 (1987); *State v. Lawrence,* 112 Idaho 149, 730 P.2d 1069, 1074 (App.1986); *State v. Moran,* 151 Ariz. 378, 728 P.2d 248, 251 (1986); *State v. Lindsey,* 149 Ariz. 472, 720 P.2d 73, 75 (1986); *State v. Myers,* 359 N.W.2d 604, 609 (Minn.1984); and *State v. Middleton,* 294 Or. 427, 657 P.2d 1215, 1221 (1983). Finally, the fact that such evidence is incidentally corroborative does not render it inadmissible, since most expert testimony, in and of itself, tends to show that another witness either

is or is not telling the truth. *See People v. Deninger,* 772 P.2d at 676. *See also, People v. Koon,* 724 P.2d 1367, 1370 (Colo.App.1986) and *State v. Myers,* 359 N.W.2d at 609. The cases have recognized that jurors, most of whom are unfamiliar with the behavioral sciences, may benefit from expert testimony explaining behavior they might otherwise attribute to inaccuracy or prevarication. *See State v. Moran,* 728 P.2d at 251.

We also find that such expert testimony augments the normal experience of jurors and helps them draw proper conclusions concerning the particular behavior of a victim in a particular case. However, expert testimony may not be admitted to tell the jury who is correct or incorrect, who is lying and who is telling the truth. *See Lawrence v. State,* 796 P.2d 1176 (Okl.Cr.1990). Once the emotional antecedents underlying the victim's behavior are explained, the jury needs nothing further from the expert. *State v. Moran,* 728 P.2d at 252. Thus, because Mr. Ernst's testimony concerned only the typical behavior patterns of child victims of sexual abuse, we find that its admission under 12 O.S.1981, § 2702 was not error.

The syndrome may only be used as a form of rebuttal to explain why the child has retracted or recanted a statement and may not be put on as direct evidence until the child has testified and recanted or retracted. The court may allow the evidence of the syndrome during the state's case-in-chief but only after the child testifies and recants or to explain a long delay in reporting the sexual abuse.

Therefore, this Court accepts the accommodation syndrome as reliable scientific evidence provided that such syndrome is testified to by an expert that is (1) subject to cross-examination, (2) that the expert testifies as to the basis for such testimony, (the general acceptance in the scientific community and his knowledge of the syndrome), and (3) that the expert testifies only as to the background and nature of the syndrome and does not state an opinion as to whether or not the particular child suffers from the syndrome but leaves that to the jury.  *Id.* at 658-660.

Federal Courts have also examined the admissibility of expert testimony offered to explain the dynamics of child sexual abuse. The most recent decisions have been rendered out of the Ninth Circuit. In *United States v. Lopez*, 913 F.3d 807, 811 (9th Cir. 2019), the defendant was denied the right to present testimony from an expert about the dynamics of Battered Woman Syndrome (BWS). The Court vacated and remanded the case and held that the testimony was proper. *Id.* at 814. In so doing, the Court reasoned:

> Courts addressing "psychological states analogous to BWS, such as rape trauma syndrome and child sexual abuse accommodation syndrome, ... have generally held expert opinion admissible for" the purpose of "disabus[ing] the jury of some widely held misconceptions about [the] victims, so that it may evaluate the evidence free of the constraints of popular myths." *Humphrey*, 56 Cal.Rptr.2d 142, 921 P.2d at 15 (Brown, J., concurring) (quotation marks and citations omitted).... Similarly, in the context of a child-abuse prosecution, we held that expert testimony on such abuse had "significant probative value in that it rehabilitated (without vouching for) the victim's credibility after she was cross-examined about the reasons she delayed reporting and about the inconsistencies in her testimony." *United States v. Bighead*, 128 F.3d 1329, 1331 (9th Cir. 1997). *Id.* at 823-824.

The defendant sought the introduction of the expert testimony because she had been physically and sexually abused and wanted to provide context as to why she was in fear and why she did not seek help from the police. *Id.* at 811. In ruling that the expert testimony was in fact admissible, the Court explained that BWS:

> [I]s a set of psychological and behavioral reactions exhibited by victims of severe, long-term, domestic physical and emotional abuse. L. Walker, *The Battered Woman Syndrome* (1984). Battered woman syndrome is not a mental disease or defect; rather, battered woman syndrome is a post-traumatic stress disorder. Its psychological effects are often similar to the effects of imprisonment on kidnap victims and prisoners of war. Once battered women believe themselves to be helpless victims of abusive men, they behave like hostages and link themselves to their captors out of fear that it is the only way to survive. Battered women are unable to respond effectively to violence because they are psychologically trapped in the violent relationship.

7

> Repeated beatings diminish the battered woman's motivation to respond and instill in her a negative belief about the effectiveness of her actions. This "learned helplessness" keeps the battered woman from leaving her batterer. One of the primary survival skills of battered women is hyperalertness. The battered woman learns to be sensitive to her environment to prevent further violence to herself. The development of survival skills, however, comes "at the expense of escape skills." L. Walker at 33 & 87-89. Society often misinterprets the survival skills of battered women as signs of passivity and weakness coupled with an unwillingness to leave the violent relationship. *Id.* at 33. A common misunderstanding is that the battered woman's responses are indicative of weak character. Rather, these responses must be seen as attempts to cope with the abusive and controlling environment in which she lives and from which she is helpless to escape. *Id*. at 816-817.

In *Hernandez v. Beard*, 2018 WL 3702399, *1 (E.D. California 2018)(only citation currently available)(slip opinion), the defendant was convicted in State Court and then filed a Petition for Writ of Habeas Corpus. At the trial court level, the defendant had filed a Motion in Limine to exclude expert testimony regarding CSAAS. *Id.* The trial court denied the Motion and held:

> Expert testimony on CSAAS may be offered to explain a victim's failure to report, or delay in reporting, sexual abuse. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300.) Such expert testimony is not admissible to prove that the offenses occurred, but it may be admissible to disabuse the jury of myths or misconceptions it might hold about how a child reacts to a sexual offense. (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744.) *Id.*

The defendant alleged in his Habeas Petition that his right to due process and a fair trial were violated by the admission of the CSAAS testimony. *Id.* at 3. The District Court found:

> [D]efendant has not established that the trial court abused its discretion in admitting the CSAAS evidence. The testimony was relevant because the victim did not promptly report the abuse. And the trial court explained that in its experience, some of the myths about which the expert would testify are still commonplace… *Id.*

8

Significantly, the District Court also found:

> The Supreme Court has never indicated that introduction of evidence related to CSAAS generally, as it was introduced in this case, or the introduction of materially analogous evidence, violates any Constitutional right. *Id.* at 4.

The Northern District of California recently examined the issue of expert testimony in a child abuse case in *Amaya v. Frauenheim*, 2018 WL 2865222 (N.D. California 2018)(only citation currently available)(slip opinion). The defendant was convicted by a jury, the California Court of Appeals affirmed, and the defendant filed a habeas corpus case. *Id.* at *1. At the jury trial, Miriam Wolf, a licensed clinical social worker, testified as an expert in CSAAS. *Id.* at *3. Ms. Wolf explained the findings in Dr. Roland Summit's article on CSAAS in the following way:

> Wolf testified that CSAAS is a term that first appeared in an article by Dr. Ronald Summit in the Journal of Child Abuse and Neglect in 1983. Dr. Summit wrote the article to document some of the behavior he saw in treating child victims of sexual abuse. He wrote the article because the child victims he was familiar with displayed patterns of behavior that were unexpected by adults. Wolf testified that the article was not a research article; it was based on anecdotal evidence. And she testified that CSAAS is not an actual syndrome or a diagnosis indicating whether a child has been sexually abused.
> Wolf also testified that CSAAS consists of five categories of behavior: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed, conflicted, and unconvincing disclosure; and (5) retraction. Secrecy refers to the fact that abuse generally occurs in secret. The abuser is often in a position of power, and communicates the need for secrecy to the child. Helplessness refers to the child's cognitive inability to understand and appreciate the consequences of a sexual encounter with an older person. The child may experience emotional helplessness because the abuser sends the message that the child cannot disclose the abuse to trusted persons such as teachers and parents, or the child believes that such people will not be available to help them. Entrapment and accommodation mean that children have to figure out how to cope with the situation and continue with their daily lives. Some children appear outwardly healthy, while others may develop psychosocial symptoms as a way of coping. Delayed, conflicting, or unconvincing disclosure means the child may not disclose the abuse for a long period of time, and the disclosure does not "come out in a nice, neat package the way an adult might expect it to...." The disclosure may

> be conflicted or unconvincing, and parts of it may not make sense to an adult. And finally, retraction or recantation refers to the fact that a child may take back claims of abuse due to the consequences of disclosure, such as the loss of parental support or criminal prosecution.
>
> Wolf noted that Dr. Summit published a subsequent paper in 1992 expressing concern about how CSAAS was being used in court. He wrote that he had never intended for CSAAS to be used as a diagnostic tool or checklist. He had only intended to dispel myths held by many adults about how children would behave when molested. Dr. Summit expressed concern that prosecutors were using CSAAS to prove criminal cases, whereas CSAAS is not intended to be used to determine the truth or falsity of allegations. Instead, CSAAS starts with the premise that allegations made by a child victim are true.
>
> Wolf testified that she had seen many of these patterns of conduct in children she had worked with. She also noted that Dr. Summit's research has not been universally accepted by other researchers, but there is a "growing consensus" on many aspects of CSAAS. As to delayed disclosure, Wolf testified that there is "a lot of consensus among different researchers that children don't disclose sexual abuse for lengthy periods of time, sometimes into adulthood. When they do disclose, it is often after lengthy delays." On cross-examination, Wolf testified that recantation or retraction is not as common as Dr. Summit believed it to be at the time of his original article. *Id.* at *3-*4.

In its opinion, the District Court found:

> In *Brodit*, the Ninth Circuit recognized that CSAAS evidence "describes various emotional stages, experienced by sexually abused children, that may explain their sometimes piecemeal and contradictory manner of disclosing abuse." 350 F.3d at 991. The court observed that inconsistencies in a child's account of abuse, including delays in reporting, do not necessarily mean the child is lying. *Id.* Ultimately, the *Brodit* majority approved of the California Court of Appeal's holding in *People v. Patino*, 26 Cal. App. 4th 1737 (1994), that the use of CSAAS evidence in a child abuse case does not necessarily offend a defendant's due process rights. *Brodit*, 350 F.3d at 991. *Id.* at *7.

The Court then addressed the defendant's specific objections and found that the expert had satisfied the Court that adults still hold myths and misperceptions about CSAAS and the expert's testimony was never offered as evidence that the victim had been molested. As such, the Court denied the defendant's Petition. *Id.* at *8.

10

The District of Columbia Court of Appeals considered the issue of expert testimony in a child sexual abuse case in 2010. In *Jones v. United States*, 990 A.2d 970 (DC 2010), the defendant was convicted and alleged on appeal that the trial judge had committed reversible error by "admitting expert testimony explaining the methods of child sex offenders and the reactions of their immature victims." *Id.* at 972. The Court disagreed and affirmed the conviction. *Id.*

In *Jones*, the Government offered their expert as:

> [A]n "education" witness who would describe in general terms how "preferential" child molesters "groom" and manipulate their immature victims, how those victims become compliant and cooperate with their abusers, and how they delay reporting their abuse and provide inconsistent accounts because they feel shame, embarrassment and guilt on account of their acquiescence. *Id.* at 974.

The expert did not testify about the facts of the case and "expressed no opinion on appellant's guilt or the credibility of the accusers." *Id.* at 973-974. The expert described the key features of the grooming process:

> [T]he abuser identifies and tries to fill a child's needs, for example by listening sympathetically to the child, complementing her on her looks, giving her hugs, and buying her things she needs.
> After having formed a relationship of trust and dependence, the abuser undertakes to manipulate the child's feelings and overcome her sexual inhibitions… Children from dysfunctional homes, especially teenagers, are most susceptible to being groomed in this way… The grooming process results in what Lanning called "compliant victims"-children who cooperate in their victimization. Their non-resistance may seem to indicate consent, Lanning stated; indeed, the children may return to their abusers and even enjoy the sexual activity. However, Lanning opined, compliant victims "suffer a lifetime of shame, embarrassment and guilt because their victimization does not fit society's understanding" that children do not willingly acquiesce in abuse. According to Lanning, those feelings help explain why victimized children fail to disclose or delay disclosure of their abuse, and why their disclosures often contain "incomplete," "inaccurate," "distorted," or "contradictory" information. (On cross-examination, Lanning conceded that some children may give contradictory accounts of abuse simply because they are being untruthful.) *Id.* at 976.

The Court found that "jurors cannot be presumed to have knowledge of these matters" and "the average layperson lacks knowledge regarding the manner in which preferential sex offenders operate". *Id.* at 978. The Court recognized that the expert's testimony "was critical in dispelling from the jurors' minds the widely held stereotype of a child molester as 'a dirty old man in a wrinkled raincoat' who snatches children off the street as they wait for the school bus." *Id.*

In the Western District of Oklahoma, a defendant filed for Habeas relief after the State offered expert testimony in the area of human sexual response at his jury trial. *Leyja v. Oklahoma*, 2010 WL 1881462 (W.D. Okla. 2010)(only citation currently available). Although the victim in the case was an adult at the time of her sexual assault, the ruling is applicable because the Court found:

> The federal district court is bound by the OCCA's conclusion that the nurse had qualified as an expert and that her testimony had been admissible under Oklahoma law. Because the testimony was admissible under state law, the ruling could not have deprived Mr. Leyja of fundamental fairness. *Id.* at *6.

In *Brodit v. Cambra*, 350 F.3d 985, 991 (9th Cir. 2003), the Ninth Circuit compared the admission of expert testimony on the issue of CSAAS to the United State Supreme Court's approval of expert testimony on the issue of battered child syndrome. The defendant was convicted in State court and then filed a Writ of Habeas Corpus. In reviewing the record, the Court found:

> As explained in the state-court record, CSAAS describes various emotional stages, experienced by sexually abused children, that may explain their sometimes piecemeal and contradictory manner of disclosing abuse. Under the CSAAS analysis, inconsistencies in a child's accounts of abuse do not necessarily mean that the child is lying. The child could be telling different parts of what happened to different adults, based on the child's comfort level with each adult or on the developmental immaturity of the child's memory.
> Petitioner argues that the prosecution's presentation of CSAAS testimony made it impossible for him to defend himself because the expert "told jurors that no matter what a child says or does, it is consistent with the child['s] having been molested" and

12

> thereby "effectively insulated the child from Petitioner's challenges to her credibility."
>
> In the unpublished portion of its opinion in this case, the California Court of Appeal rejected that argument, citing *People v. Patino,* 26 Cal.App.4th 1737, 32 Cal.Rptr.2d 345 (1994). *Patino* held that the use of CSAAS evidence in a child abuse case does not necessarily offend a defendant's due process rights. The court emphasized the importance of a cautionary instruction. *Id.* at 348–50. Such an instruction was given in this case.
>
> The *Patino* court relied on the Supreme Court's decision in *Estelle v. McGuire,* 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), which held that the admission of expert evidence on battered child syndrome did not violate a defendant's due process rights. *Patino,* 32 Cal.Rptr.2d at 351. Battered child syndrome seeks to explain physical injuries, rather than behavior. Nonetheless, the Court admonished generally that, while the Due Process Clause secures fundamental fairness for criminal defendants in state trials, it should not foster federal courts' undue interference with state criminal procedures. *Estelle,* 502 U.S. at 70, 112 S.Ct. 475.
>
> More on point, we have held that CSAAS testimony is admissible in federal child-sexual-abuse trials, when the testimony concerns general characteristics of victims and is not used to opine that a specific child is telling the truth. *United States v. Bighead,* 128 F.3d 1329 (9th Cir.1997) (per curiam); *United States v. Antone,* 981 F.2d 1059 (9th Cir.1992). Although those cases did not address due process claims, both rejected the contention that CSAAS testimony improperly bolsters the credibility of child witnesses and precludes effective challenges to the truthfulness of their testimony—the very arguments that Petitioner advances here. *See Bighead,* 128 F.3d at 1330–31; *Antone,* 981 F.2d at 1062. *Id.*

The Tenth Circuit specifically examined the issue of expert testimony in cases involving child sexual abuse in *United States v. Charley*, 189 F.3d 1251 (10th Cir. 1999) and again in *United States v. Velarde*, 214 F.3d 1204 (10th Cir. 2000). In *Charley*, the defendant was convicted in Federal Court of seven counts of sexual abuse of a child in Indian county. *Id.* at 1254. The Court found that the district court did not abuse its discretion by allowing an expert to:

> "inform the jury of characteristics in sexually abused children and describe the characteristics the alleged victim exhibits."; *see also United States v. Wright,* 119 F.3d 630, 635 (8th Cir.1997) (stating that a witness's testimony that he "conducted a 'Sexual molestation exam' and that in his opinion the lack of

13

> medical evidence was not inconsistent with molestation" was admissible); *United States v. Johns,* 15 F.3d 740, 743 (8th Cir.1994) (allowing an expert to tell the jury about typical "emotional and psychological traits for abuse victims," and noting that such testimony was admissible because the witness "made no comment on [the alleged victim's] credibility nor did [the witness] identify [the alleged victim] as a victim of child abuse"). *Id.* at 1264-1265.

The Court then examined the testimony of other experts who testified in the case and found it improper because one offered an "unconditional opinion that each of the girls was in fact sexually abused" and the others "assumed that the girls had been abused and stated it as a fact." *Id.* at 1266 and 1271. Although the Court found that the error in admitting the particular testimony did not affect the defendant's substantial rights and upheld the defendant's convictions on counts two through seven, the Court reversed count one of the defendant's conviction based upon other grounds. *Id.* at 1272-1273.

In the *Velarde* case, the defendant was convicted in Federal Court of aggravated sexual abuse of a child within Indian county. *Velarde* at 1204. Prior to trial, defendant filed a Motion in Limine seeking to exclude certain expert testimony. *Id.* at 1207. The Court found that statements by the expert that she diagnosed child sexual abuse based upon the child's statements and statements that the victim was not "subject to either lying or exaggerating" should not have been admitted without a reliability hearing. *Id.* at 1209-1211.

The Tenth Circuit has also upheld the use of expert testimony when explaining Battered Women's Syndrome. In *Paine v. Massie*, 339 F.3d 1194 (10th Cir. 2003), the Court found:

> Misconceptions regarding battered women abound, making it more likely than not that the average juror will draw from his or her own experience or common myths, which may lead to a wholly incorrect conclusion. Thus, we believe that expert testimony on the syndrome is *necessary* to counter these misconceptions." *Id.* at 8; *accord Dunn v. Roberts,* 963 F.2d 308, 313-14 (10th Cir.1992) (recognizing that an "expert [BWS] opinion is particularly useful and oftentimes

necessary to interpret for the jury a situation beyond average experience and common understanding").

In the case at bar, the Government assures the Court that it will follow the guidelines and precedent in the presentation of its expert testimony. Because this case involves sexual abuse and physical abuse that began when the victim was very young and continued until she was an adult, the Government asserts that laypersons will not have a common understanding of the dynamics involved in such situations. The Government will seek to educate the jury on areas outside of its common knowledge and understanding by asking its expert to explain the general dynamics of child sexual abuse, child sexual abuse accommodation syndrome, domestic violence, and captivity stress, trauma, and loss. At no time will the Government ask its expert to offer an opinion on whether or not abuse actually occurred in the case at bar, the credibility of the victim, nor the guilt of the Defendant. As such, the Government's proposed expert testimony should be properly admitted and the Defendant's Motion in Limine should be denied.

## CONCLUSION

For the above stated reasons above, the Government requests that the Defendant's Motion in Limine Re: Expert Testimony of Dr. Joann Behrman-Lippert be denied.

Respectfully submitted,

BRIAN KUESTER
United States Attorney

s/   Sarah McAmis
SARAH McAMIS, OBA # 15903
Assistant United States Attorney
520 Denison Avenue
Muskogee, Oklahoma 74401
Telephone: (918) 684-5100

15

**CERTIFICATE OF SERVICE**

  I hereby certify that on this 16th day of May, 2019, I electronically transmitted the attached documents to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrant:

  Warren Gotcher
  Counsel for Defendant

          s/  Sarah McAmis
            SARAH McAMIS
            Assistant United States Attorney