# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| *Plaintiff,* | |
| **v.** | **Case No. CR-17-0079-RAW** |
| **HENRI MICHELLE PIETTE,** | |
| *Defendant.* | |

## GOVERNMENT'S TRIAL BRIEF

**COMES NOW** the plaintiff, the United States of America, by and through Brian J. Kuester, United States Attorney for the Eastern District of Oklahoma, and D. Edward Snow, Assistant United States Attorney, and Sarah McAmis, Assistant United States Attorney, and respectfully submits its Trial Brief in this matter.

## I.

## STATUS OF THE CASE

A.   A trial is set for May 29, 2019, at 9:00 a.m. before the Honorable Ronald A. White.

B.   Estimated time for Government's case in chief is 6 days.

C.   Defendant is in custody.

D.   Trial by jury has not been waived.

E.   An interpreter will not be required.

F.   The Government expects to call approximately 24 witnesses.

G.   The Government expects to introduce approximately 20 exhibits consisting of an audio recording of the Defendant's interview with law enforcement, a video recording of the Defendant answering a reporter's questions, photographs, identification documents, and records.

1

H.   Stipulations have not yet been reached but defense counsel is speaking with his client regarding a stipulation as to the DNA results showing the Defendant is the father of 9 children born of the victim.

I.   The Defendant has not given notice of any defense, alibi, or witnesses they intend to call at trial.

J.   The Defendant has provided no discovery.

## II.

## ELEMENTS

**Count One: Kidnapping in violation of 18 U.S.C. § 1201(a)(1) & (g)**

> *First*: the defendant, knowingly acting contrary to law, kidnapped the person described in the indictment by [seizing] [confining] [inveigling] her as charged;
>
> *Second*: the defendant kidnapped the person for some purpose or benefit;
>
> *Third*: the defendant willfully transported the person kidnapped; and
>
> *Fourth*: the transportation was in interstate commerce;
>
> To "kidnap" a person means to unlawfully hold, keep, detain, and confine the person against that person's will. Involuntariness or coercion in connection with the victim's detention is an essential part of the offense.
> [To "inveigle" a person means to lure, or entice, or lead the person astray by false representations or promises, or other deceitful means.]
> In the third element, the term "willfully" means that the defendant acted voluntarily and with the intent to violate the law.

Source: Pattern Crim. Jury Instr. 10th Cir. 2.55 (2018). See also *United States v. Walker*, 137 F.3d 1217, 1220 (10th Cir. 1998) holding "The elements of kidnapping are (1) transportation in interstate commerce (2) of an unconsenting person who is (3) held for ransom, reward, or otherwise, (4) with such acts being done knowingly and willfully.

**Count Two: Travel With Intent to Engage in Sexual Act with a Juvenile in violation of 18 U.S.C. § 2423(b)**

*First:* The defendant traveled in interstate commerce;

*Second*: For the purpose of engaging in a sexual act with a person under 18 year of age; and

*Third*: Said sex would have been a violation of Federal law.

Source: 18 U.S.C. § 2423(b) (October 1996 to 0ctober 29, 1998 version).

The term "sexual act" means

(A) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however, slight;
(B) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus; or
(C) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

Source 18 U.S.C. § 2246(2) 1997 version (previously codified in 18 U.S.C. §2245 and

renumbered as § 2246 in 1994 by Pub.L. 103-322, Title IV, § 40502, Title VI, § 60010(a)(1)).

As a matter of law you are instructed that it is violation of federal law to engage in a sexual act with a person who has attained the age of 12 years but has not attained the age of 16 years; and is at least four years younger than the person so engaging.

Source 18 U.S.C. § 2243(a) (September 30, 1996 to October 29, 1998 version).

3

### III.

### INTRODUCTION

On January 31, 1997, Gayla Joan Piette, reported her daughter, R.M.M. (victim) (12 yoa), was kidnapped by her step-father, Henri Michelle Piette (Defendant), in Poteau, Oklahoma. Gayla Piette told the police that her daughter left the Poteau, Oklahoma Middle School with a young white male, believed to be the juvenile victim's step-brother, T.P. Gayla Piette had been staying at a woman's shelter for domestic violence victims in the area and her daughter was staying with her and attending the school. Gayla Piette said that she married the Defendant on April 2, 1996, at Wagoner, Oklahoma. Gayla stated that she left the Defendant due to his abusive behavior.

On July 28, 2016, R.M.M. (Hereafter "victim") appeared with eight children at the United States Consular General Offices in Nogales, Mexico requesting assistance to get her and her children away from the Defendant. Victim reported she was raped by her stepfather, Henri Michelle Piette, as a minor and throughout the entirety of their relationship. The victim had been kidnapped from school, physically and sexually abused on a regular basis since 1994, forced to change her name, forced to file false police reports, forced to write letters to her mother indicating that she was a runaway, and witnessed many crimes by the Defendant. She said the Defendant has used many different aliases: Billy Ira Sloop Jr., Michael Wayne Mansfield, and Christopher Allen McAnear (she said she went by Christina McAnear). She stated the Defendant started to sexually molest her when she was 10 years old in Springfield, Missouri, and he continued to frequently sexually molest her on a weekly basis. She said the Defendant had children from previous relationships, S.R., T.P. and Mi.P.

The victim said that when she was about 12 years old, T.P. came to her school to pick her up as part of a plan orchestrated by the Defendant. T.P. drove her in a truck to the Defendant at a

place where he was living. The plan was that if the family was ever separated, she should look for the pre-determined signals and signs and/or phrases from the Defendant. If she saw any of those, she should leave wherever she was located and go to the Defendant and he would re-unite the family to include her mother. Upon meeting the Defendant after leaving the school, Defendant told her that he would come back for her mother, but they were leaving. When they got out of town, he told her she was now a runaway and would get in trouble if they ever went back. Defendant also told her she would go to reform school and her mother did not want her. The victim stated they traveled around the United States for about a year, living in trailer parks and ranches until they crossed the border into Puerto Penasco, Sonora, Mexico. She, the Defendant, and her step-brothers and sister, traveled and lived in the U.S. and Mexico. She stated during this time she was sexually molested almost daily by the Defendant. She stated he would use sex as a punishment and was physically abusive to everyone in the family, including her.

The victim said that when she was 12 years old and while on the road with the Defendant, she became pregnant with the Defendant's child, but she had a miscarriage. She stated that she never saw a doctor but thinks she lost the child in the first three months of the pregnancy.

The Defendant forced her to dye her hair black and wear glasses so people would not recognize her. She provided photographs that included her with different appearances. The Defendant made her use the name Christina McAnear when she went to school for a few months, but she had to leave school and they went back to Mexico when he thought a teacher was suspicious of them. When she was 18 years old, the Defendant forced her to go to a police station in Phoenix, Arizona to report that she was not kidnapped and that she had run away from home because of her poor family life. She said the Defendant forced her to report to the police and, if she did not, he would beat her and disappear in Mexico with her children. She stated he also said he would perform

5

"sexual things that she did not like and were painful" to her if she did not go confess to the police. She stated he also forced her to call "Child Find" so her family and the police would stop looking for her. She stated that, during this time, they would go to the U.S. and he would make her write letters in her handwriting that he had dictated and send to people to make it appear she was moving around the U.S. as a runaway.

She described a wedding ceremony between her and the Defendant which occurred in Wagoner before she left the school. She said the date was April 1, 1996. She said her step-brother, T.P., performed the ceremony. She was 11 years old at the time. When her step-brother was interviewed, he confirmed the wedding and that he performed it.

When they were living on a ranch in Navajo, Arizona, the Defendant forced her to legally change her name from R.M.M. to S.L.R. She stated that the Defendant told her that if she did not do it, "they would both be in trouble," and he would disappear in Mexico with her children. She provided identifications in the new name, as well as several identifications for her and the Defendant in several other names. She stated the Defendant did crystal meth and was very abusive toward her and her children. She stated that her children have probably been sexually assaulted by the Defendant as well. When the children were interviewed, they confirmed the Defendant was sexually abusing them.

E.P. was one of the children she had by the Defendant. E.P. ran away from Mexico and was located in the United States. He was born in a van on April 23, 2000 in Mexico. The victim would have been 15 years old and 11 months at the time of the birth. E.P. corroborated the sexual abuse of his siblings and the physical abuse all the family endured at the hands of the Defendant. E.P. described an upbringing where the Defendant controlled all aspects of the family's daily life. The Defendant would have the family beg for money, they would have to give all of the money to

6

him, and he would spend it on alcohol and drugs.

T.P. was located and interviewed. He related, when he was about 15 years of age, he performed a marriage ceremony between the Defendant and the victim. The victim was 11 years old at the time and they lived in Wagoner, Oklahoma. The Defendant and the victim were already in a relationship and the Defendant told him (T.P.) he could perform the marriage ceremony because he was part of the Aaronic Priesthood in the Mormon Church. The wedding ceremony consisted of T.P. asking if the Defendant and the victim took each other in marriage. He then said that the Defendant could "kiss the bride." The Defendant then gave the victim a kiss on the mouth. On numerous occasions after the marriage ceremony, T.P. witnessed the Defendant and the victim in bed together. T.P. said the Defendant was physically and emotionally abusive to his children and his wives. T.P. said the Defendant fathered 9 children with the victim.

T.P. indicated that, while living in Wagoner, the victim's mother left the Defendant. They briefly reconciled, but separated again when he beat her up. The beating was so severe, T.P. was afraid the Defendant might kill his wife. It was when the victim's mother moved out, that the victim went to live with her mother at the shelter.   The victim was attending Pansy Kids Elementary School at the time. The Defendant had T.P. borrow a neighbor's truck and drive to the victim's school and pick her up. The Defendant told T.P. that if they were discovered by law enforcement, T.P. should take the "rap." The Defendant told T.P. that if the Defendant was caught by law enforcement, "They will throw me away for life."

When T.P. and the victim returned to where the Defendant and her step-brothers and sister were living, they immediately packed and left for Tulsa, Oklahoma. They left everything they had behind and took only what would fit in a small car. In Tulsa, they switched to a new vehicle so that they would not be found. T.P. said they knew law enforcement would be looking for the

victim. When they left, they went to Tulsa and stayed in hotels until they left to live in numerous other states (from Montana to California) and also lived in Mexico. They begged for money as they traveled to fund their life on the run. The Defendant and victim lived as a couple when not in public. In public, however, the Defendant told people they encountered that the victim was his daughter. He concealed the victim having children by saying she had conceived children with a Mexican boyfriend. T.P. said that the Defendant kept the victim from talking to family. T.P. said that the Defendant made all the decisions and dictated all their actions. He was very dominant and physical. T.P. claims the victim was "programmed" by the Defendant as were all the children. T.P. saw the Defendant strike the victim constantly.

Mi.P. was another of the Defendant's children who observed the sexual abuse of the victim (his step-sister) and the physical abuse of the victim and family as well as the Defendant sexually abusing other children.

All of the Defendant's nine children, he fathered with the victim, were interviewed and described sexual and physical abuse by the Defendant as detailed in the Government's Notice of Intent to Admit Evidence of Other Child Molestations and Notice of Intent to Admit Evidence of Other Crimes, Wrongs or Acts (Doc. 132).

The Defendant was interviewed by both the F.B.I. and the investigator from the Wagoner County District Attorney's Office. The Defendant claimed he thought the victim was emancipated at 12 years of age and she was going with him willingly. He acknowledged the marriage to the victim when she was 12 years old, to having sex with her when she was 14, and fathering 9 children with her. The Defendant acknowledged some physical abuse.

## IV.

### PROPOSED WITNESSES, CONTENT AND
### TIME OF DIRECT EXAMINATION

The Government expects to call the following witnesses in its case-in-chief and anticipates

that the direct examination of each will not be greater than that set forth opposite each name:

***Note:*** This is not an exhaustive list of potential witnesses in the case, but merely the witnesses that the Government believes at this time may be called to testify.   A list of potential witnesses will be available for the Court to use during *Voir Dire* of the prospective jurors.

1.      E.P. Approx. 1 hour 30 Minutes

***Anticipated Testimony:***

He was the son of the victim and the Defendant. He was born in Mexico when his mother was 15 and the Defendant was approximately 47. He was physically abused by his father and he observed his father physically and sexually abuse his siblings and physically abuse the victim. He ran away when he was a teenager. He will testify as to the defendant's attempts to program him and the other family members using the Bible, physical abuse, and threats.

2.      R.M.M.   Approx. 5 hours and 30 minutes

***Anticipated Testimony:***

She is the victim in the case and will testify as detailed above.

3.      Mi.P. Approx. 2 hours and 30 Minutes

***Anticipated Testimony:***

He was the victim's step-brother and the son of the Defendant. He will testify as outlined above.

4.      Ma.P.   Approx. 1 hour

***Anticipated Testimony:***

Ma.P. is the victim's daughter. She disclosed that the Defendant was very abusive to the victim and that she witnessed many beatings.  Ma.P. also described the physical abuse that the Defendant inflicted on her, including hitting her so hard that he broke her finger and wrist and that he choked her. Ma.P. also disclosed that the Defendant tried to

have sex with her and that he would touch her body and private parts, both when her clothes were on and when her clothes were off.

Ma.P. stated that the Defendant would say he wanted to be alone with her when he was going to sexually abuse her. Ma.P. described that the first incident of sexual abuse occurred when she was around four-years-old. The Defendant saw Ma.P. in her underwear, made her come closer to him, and then started touching her. As the sexual abuse progressed over the years, the Defendant made Ma.P. masturbate his penis with her hands, he put his penis in her mouth and he ejaculated in her mouth on countless occasions. If the Defendant did not think that Ma.P. was properly performing oral sex, he would beat her. The Defendant also performed oral sex on Ma.P. When the Defendant first attempted to put his penis in Ma.P.'s vagina, it would not fit so he would insert his fingers and other objects instead. He would also insert objects as a form of punishment. The Defendant later progressed to inserting his penis. The Defendant would instruct Ma.P. to dance and strip for him, he would tell her what expressions to make on her face to indicate that she "wanted" sexual activity, and he would make her tell him that she in fact "wanted" it.   On occasion, the Defendant would give Ma.P. drugs and/or alcohol before he sexually abused her.

Ma.P. witnessed the Defendant abusing her siblings. During one incident, the Defendant required Ma.P. and the others to leave the house while he remained alone inside with A.P. Ma.P. snuck back inside, discovered A.P. crying, and knew what the Defendant was doing to A.P. by the expression on her face. During other incidents, the Defendant would threaten to hurt or kill Ma.P. or her siblings. The children knew that if one was being beaten, another could "tap in" and take the beating on behalf of their sibling.   They also knew that if they "tapped in", the punishment would be increased.

5.      A.P.   Approx. 1 hour

***Anticipated Testimony:***

A.P. is the victim's daughter. She too described the domestic violence that she witnessed the Defendant inflict upon the victim. A.P. described seeing the Defendant shoot at the victim and hit her with a baseball bat. A.P. explained that the Defendant had also physically assaulted herself and her siblings. She described the Defendant hitting her siblings and threatening them with a machete. A.P. said the Defendant pulled her hair and threw her down.

A.P. described that both herself and her brother, R.P., had seen the Defendant sexually abusing their sister Ma.P.   A.P. also described the sexual abuse that she had suffered. A.P. detailed how the Defendant would make her masturbate him, how he would put his mouth on her vagina, how he would put his fingers in her vagina, how he would rub his penis on her vagina, and how he would put his penis in her mouth.

6.      R.W.P. Approx. 25 Minutes

*Anticipated Testimony:*

R.W.P. is the victim's son He described the times he saw the Defendant hit the victim, punch her in the throat, strike her with a baseball bat, and stab her. R.W.P. described how the Defendant hit R.W.P. and his siblings with a stick, a board, and a switch. R.W.P. disclosed that he had witnessed the Defendant sexually abusing both his sister Ma.P. and his sister A.P. R.W.P. also disclosed that he had been sexually molested by the Defendant.

7.      I.P. Approx. 25 Minutes

*Anticipated Testimony:*

I.P. is the victim's son. I.P. described that, on many occasions, he witnessed the Defendant beating the victim. I.P. said that he saw the Defendant punching the victim in the throat, cutting her with a knife, hitting her in the head with a baseball bat, and firing shots at her from a gun. I.P. also disclosed that he had seen the Defendant touching his sister Ma.P.'s vagina on several different instances.

8.      R.L.P. Approx. 15 Minutes

*Anticipated Testimony:*

R.L.P. is the victim's daughter. R.L.P. described how the Defendant would hit her and her siblings in the face and stomach.   R.L.P. also described that she witnessed the Defendant sexually abusing her sister Ma.P

9.      Gayla McGinnis (Formerly Gayla Jean Piette) Approx. 2 hours

*Anticipated Testimony:*

She is the victim's mother and will testify about her relationship with the Defendant and the victim's disappearance.

10.     Dale McGinnis   Approx. 1 hour and 30 minutes

*Anticipated Testimony:*

He is the biological brother of the victim. His mother is Gayla McGinnis. He will testify about how the Defendant came into their life in Springfield Missouri and how he was aware of the Defendant's plan to get the children and reunite the family and he was supposed to go too. The Defendant coached all the kids that if they were stopped by the police to cry. They were supposed to tell the police they wanted to be with him. The Defendant also told them if they ended up in school, that he would come get them and

reunite the family. After the victim disappeared, Gayla McGinnis contacted the shelter, school, police, the church, and the FBI trying to get assistance. Gayla McGinnis passed out flyers at Wal-Mart and even took trips to places she thought the Defendant might have taken the victim.

11.    David Fontinel Approx. 1 hour and 30 minutes

*Anticipated Testimony:*

David was a friend of the Defendant's and was present when E.P. was born in a van in Mexico. He observed the Defendant with the children and the Defendant went by different names, as did his family members. He will testify as to the many conversations he had with the Defendant, and that the Defendant claimed that E.P. was not his son.

12.    Special Agent Eric Beltz Approx. 20 minutes

*Anticipated Testimony:*

Collected evidence in the case. Specifically took DNA swabs.

13.    Special Agent Daniel Douglass   Approx. 20 minutes

*Anticipated Testimony:*

Collected evidence in the case. Specifically took DNA swabs.

14.    Alan Giusti Approx. 2 hours

*Anticipated Testimony:*

He will testify that he is with the F.B.I. forensic DNA unit and he conducted DNA analysis and will testify as to the results.

15.    Special Agent Mike Rivers Approx. 30 minutes

*Anticipated Testimony:*

He is an F.B.I. agent and collected the Defendant's DNA evidence and was present when the Defendant was interviewed.

16.    Deputy T.J. Ponds Approx. 15 minutes

*Anticipated Testimony:*

He was present and escorting the Defendant to Court when the Defendant made statements to the news reporter.

12

17.     Special Agent Adam Reynolds Approx. 2 hours

***Anticipated Testimony:***

He is the case agent on the case. He interviewed multiple witnesses, obtained records, was present when the Defendant's DNA was taken, and was present during interviews of the Defendant.

18.     JoAnn Behrman-Lippert, Ph.D. Approx. 2 hours

***Anticipated Testimony:***

She will testify about the process of disclosure, delayed disclosure, and the stages of disclosure for persons who have been subjected to sexual abuse, including the stages of recantation and reaffirmation and how physical violence and abduction/kidnapping affects the dynamics of sexual abuse. She will testify about the process of offender "grooming". She will testify about the dynamics of captivity stress, trauma, and loss, and how each of these lead a victim to feelings of helplessness, isolation, identity rupture, deception, secrecy, adultification, and immersion in a manufactured reality and how each of which may in turn prevent a victim from attempting to escape. She will testify about the stages of adaption to captivity. She will testify how a mother's fear of harm or injury to her children impacts all stages of the mother's victimology.

19.     Special Agent J.C. Bowers Approx. 15 minutes

***Anticipated Testimony:***

He is an F.B.I. agent. He collected evidence in the case.

*20.*    Stephanie Stephens   Approx. 2 hours

***Anticipated Testimony:***

She is an investigator with the Wagoner County District Attorney's Office. She conducted an interview with the Defendant where he admitted to the marriage to the victim and admitted having sex with her when she was 14. He admitted to fathering 9 children with the victim. He admitted to striking the victim with a bat and breaking her arm. He indicated that she was old enough to have sex with him at 14. He quoted the Bible during the interview. He said everyone is lying on him and he is not a monster. He talked about how much the victim wanted him sexually.

21.   T.P. Approx. 2 hours

***Anticipated Testimony:***

He will testify as detailed above. He will testify regarding the taking of the victim. He will testify how the Defendant interacted with the victim and the other family members. He will testify about the wedding. He will testify about the physical and sexual abuse he observed.

22.   Brad Haslam Approx. 1 hour.

***Anticipated Testimony:***

He will testify the Defendant often asked him for money and assistance and he helped the Defendant. He observed the Defendant with the children. He was told by the Defendant that the children were not his (the Defendant's) but later the Defendant told him he had lied and that the children were indeed his.

23.   Records Custodian Wagoner Public Schools Approx. 15 minutes

***Anticipated Testimony:***

Can substantiate the time frame via school records that the family was located Wagoner.

*24.*   Records Custodian Wagoner Public Utilities Approx. 15 minutes

***Anticipated Testimony:***

Can substantiate the time frame via utility records that the family was located Wagoner.

## V.

## PERTINENT LAW

**Consent as a defense to Kidnapping.**

A victim's lack of consent is a fundamental element of the offense that must be proved beyond a reasonable doubt, however, a victim may be seized or detained by either physical or *mental* means. *See Chatwin v. United States,* 326 U.S. 455, 460 (1946)("[t]he act of holding a kidnapped person for a proscribed purpose necessarily implies an unlawful physical or *mental*

14

restraint") (emphasis added); *United States v. Macklin,* 671 F.2d 60, 65-66 (2nd Cir. 1982)(explaining that kidnapping statute "specifies seven methods by which a victim may be 'taken,'" five of which - "seizing, confining, kidnapping, carrying away - involve an actual physical or bodily carrying away or restriction of the victim," whereas the remaining two methods - inveigling or decoying - involve nonphysical takings by which the kidnapper, through deception or some other means, lures the victim into accompanying him"). This is precisely the case here. The Defendant, after sexually abusing a 12 year old child and marrying her, kidnapped the victim creating a plan to meet for the stated purpose to reunite with the family, only to tell the victim that he could not reunite her with her mother and family, and that she was now in trouble as a runaway and would be imprisoned if she went back to her mother and her family.

Consent should not be confused with willingness. While a victim may willingly accompany an abductor across state lines; that willingness is not the result of voluntary consent where it is obtained through inveiglement, decoy, deception, trickery, coercion, or some other undue mental influence. The Eleventh Circuit's decision in *United States v. Boone,* 959 F.2d 1550 (11th Cir. 1996), addressed this very point (i.e., whether an inveigled kidnapping victim's unknowing consent is valid). In *Boone,* the defendant induced the victim to travel with him from Florida to Georgia, falsely telling him they were going to a marijuana patch in Georgia. The defendant drove the victim to a remote location where he fatally stabbed and robbed him. On appeal, Boone claimed he did not violate the kidnapping statute because his victim willingly accompanied him from Florida to Georgia, and therefore, the consent vitiated his conviction. In rejecting Boone's argument, the Eleventh Circuit noted that the facts of the case presented an inveiglement or decoying situation (i.e., obtaining the apparent but unknowing consent of another) and held that under such

circumstances, a person cannot validly consent to be transported across state lines because consent obtained through deception is not entirely voluntary. *Boone,* 959 F.2d at 1557.

Other courts have reached similar results. *See also United States v. Hughes,* 716 F.2d 234, 239 (4th Cir. 1983) (holding that where kidnapper deceives victim into willingly accompanying him, *Chatwin's* (Supra) "involuntariness of seizure and detention" requirement is met despite victim's apparent willingness to accompany abductor because use of deceit interferes with the victim's exercise of free will and allows abductor to exercise control over victim's actions); *United States v. Atkinson,* 916 F.Supp. 959 (D. S.D. 1996) (summarizing cases involving consent obtained by inveiglement and deception and finding no voluntary consent where child was inveigled by false representations into accepting ride in car with defendant and then willingly remaining in car as result of defendant's ruses).

The evidence in this case showed an apparent willingness on the victim's part to accompany the Defendant from the school as part of a plan he had set in motion to reunite the family if they ever became separated. The evidence will show that the victim's willingness was obtained through some combination of inveiglement, deception, inducement, and coercion. Under these circumstances, to correctly state the law, a victim's apparent willingness to accompany a kidnapper does not necessarily equate to voluntary consent because willingness obtained through improper mental influence is not truly the result of free choice.

Accordingly, the Government will request an instruction on consent consistent with the above authority.

### Evidentiary Issues

### 1.    Credibility and Cross-Examination of Defense Witnesses

The Defense has given no notice of witnesses. Discussions have occurred regarding two witnesses that the Defense wanted to depose, as well as records custodians, but to date, the Defense has provided the Government with no reports, statements, witness lists, or physical evidence. Should the Defense present witnesses, the Government intends to cross-examine these witnesses as to the length of time it took for the witnesses to present information for the Defendant.

In *United States v. Johns*, 734 F.2d 657 (11th Cir.1984), the court recognized that such questioning, in the context of an alibi, was relevant and admissible pursuant to Fed. R. Evid. 401. *Id* at 664, and "[t]hat anyone, defendant or witness, who fails to present a defendant's alibi to law enforcement at the earliest time possible has some logical negative reflection on the credibility of the alibi defense." *Id*. The Court in *Johns*, was cognizant of the central issue of a witnesses' credibility and the necessity to test those witnesses credibility through relevant cross-examination. This line of cross-examination is relevant and proper.

### 2.   Self-serving Hearsay

This case presents the Court with ample pre-trial statements by the Defendant by way of his letters and interviews where he makes voluminous self-serving statements. Hearsay is an out of court statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801. Hearsay is generally inadmissible. Fed. R. Evid. 802. However, the Defendant's out of court statements are not hearsay when offered as admissions by a party opponent, Fed. R. Evid. 801(d)(2)(A). The United States is not precluded from introducing out of court statements by the Defendant, though the Defendant may not introduce his own statements as such statements must be offered "against a party." Fed. R. Evid. 801(d)(2).

The United States anticipates that the Defendant will attempt to introduce self-serving hearsay statements during the course of trial. The Defendant gave a Mirandized statement to law enforcement. There is wide consensus among the circuits that such out of court statements are inadmissible. *See, e.g., United States v. Rivera-Hernandez*, 497 F.3d 71, n. 5 (1st Cir. 2007) ("courts (including our own) have interpreted the requirement that a statement be offered "against a party" to mean that it must be introduced against that party's position at trial") (citing *United States v. Palow*, 777 F.2d 52, 56 (1st Cir. 1985); *Butler v. S. Pac. Co.*, 431 F.2d 77, 80 (5th Cir. 1970) ("To be received in evidence an admission … must be contrary to that party's position at the time of trial."); *Auto-Owners Ins. Co. v. Jensen*, 667 F.2d 714, 722 (8th Cir. 1981) ("An admission must be contrary to a party's position at trial."); *United States v. Quansah*, 171 Fed. Appx. 51, 52 (9th Cir. 2006) ("Self-serving statements are not exempted from the hearsay rule … or any other exemption or exception, and are thus inadmissible hearsay."); *United States v. Cunningham*, 194 F.3d 1186, 1199 (11th Cir. 1999) ("Hearsay bars a party from presenting its own statements, such as "a Defendant … attempt[ing] to introduce an exculpatory statement made at the time of his arrest without subjecting himself to cross-examination.").

The Government anticipates that it will attempt to admit portions of the Defendant's Mirandized statement(s). The Defendant may attempt to argue that the Rule of Completeness mandates that his entire 4 hour and 35 minute post-Miranda interview be admitted. This line of reasoning is unavailing, as "[t]he rule of completeness, however, does not necessarily require admission of [an entire statement, writing, or recording]. Rather, only those portions which are 'relevant to an issue in the case' and necessary 'to clarify or explain the portion already received' need to be admitted." *United States v. Lopez-Medina*, 596 F.3d 716, 735 (10th Cir. 2010). "The Rule of Completeness does not compel admission of otherwise inadmissible hearsay evidence.

[T]he Rule of Completeness was designed to prevent the Government from offering a misleadingly-tailored snippet. The Rule of Completeness warrants admission of statements in their entirety when the Government introduces only a portion of *inextricably intertwined statements*." *United States v. Goxcon-Chagal*, 2012 WL 3249473, 4, (D. N. M. 2012) (emphasis added) (internal quotations omitted). "Statements are inextricably intertwined when the meaning of a statement, if divorced from the context provided by the other statement, is different from the meaning the statement has when read within the context provided by the other statement." *Id.*

The Defendant cannot offer evidence elicited on cross-examination that is self-serving hearsay. The United States intends to admit statements into evidence made by the Defendant against his interest to law enforcement. To the extent that the Defendant believes he made favorable statements to law enforcement during his post Miranda interview, he is precluded from offering them on cross-examination as they are out-of-court statements, and as such are hearsay. The United States will not offer 'misleadingly-tailored snippets' of the Defendant's post Miranda out-of-court statements. Because of this, the Defendant may not attempt to introduce his own out-of-court statements simply because they are part of a larger statement.

The law clearly indicates that self-serving hearsay is inadmissible. To the extent the Defendant believes that his out-of-court statements are material and relevant, and seeks to introduce those statements, he must take the stand and testify.

### 3.  Business records

Defense counsel has discussed with the Government his desire to admit some of the child protective services reports into evidence as part of the Business Records Exception (Fed. R. Evid 803(6)). The discussions involved whether or not the Government would stipulate and obviate the need for the defense to present a witness. The Government pointed out to the defense that a witness

may not be necessary if the records are otherwise admissible and the Defendant provides the Government with notice and a Certificate of Authenticity of Domestic Business Records Pursuant to Fed. R. Evid. 902(11).

If, however, the Defendant provides a Certificate of Authenticity of Domestic Business Records, that does not mean the records are automatically admissible. Fed. R. Evid 803(8) governs the admissibility of public reports, not 803(6), the Business records exception.

Fed. R. Evid. 803 provides:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:…..
> (8) Public Records. A record or statement of a public office if:
> (A) it sets out:
> (i) the office's activities;
> (ii) a matter observed while under a legal duty to report, *but not including, in a criminal case, a matter observed by law-enforcement personnel*; or
> (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
> (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.
> (Emphasis added).

A number of courts have drawn the distinction for purposes of Rule 803(8)(B) between law enforcement reports prepared in a routine, non-adversarial setting, and those resulting from the arguably more subjective endeavor of investigating a crime and evaluating the results of that investigation"); *United States v. Wilmer,* 799 F.2d 495, 500-501 (9th Cir. 1986) and *United States v. Orozco,* 590 F.2d 789 (9th Cir.1979) ("the exclusionary provisions of Rule 803(8)(B) were intended to apply to observations made by law enforcement officials at the scene of a crime or the apprehension of the accused and not 'records of routine non-adversarial matters' made in a non-adversarial setting.").

The investigation by child protective service agents who were called to locations where the

children where located (the scene) in response to police interactions with the children and then make a determination as to whether or not children should be removed and referred for prosecution, is undoubtedly an adversarial matter. As such, these reports are inadmissible. Of course, the Defendant can potentially utilize these reports in his cross-examination of the witnesses for impeachment purposes regarding prior inconsistent statements.

Additionally, pursuant to Fed. R. Evid. 403, the probative value of the admission of these reports in their entirety would be substantially outweighed by a danger of unfair prejudice, confusing the issues, and misleading the jury. Wholesale admission would deny the Government the ability to cross-examine a witness who made the report to ascertain the facts of which they were obviously unaware, such as the Defendant having a wedding ceremony with the victim and the age of the children in relation to the age of the victim.

The Government is mindful of the difficulty of bringing in out of state witnesses and the Government is willing to assist the defense with admission of their evidence, but the Government is unwilling to submit voluminous DHS records to the jury without the benefit of a witness to cross-examine for the purpose of pointing out the flaws in their investigation.

The Government and the Defense will continue to work towards a resolution in the matter.

## VI.

## CONCLUSION

This Trial Brief is offered to acquaint the Court with factual and legal issues which may arise at trial. The Government requests that the Court grant it leave to submit additional memoranda at a later time.

Respectfully submitted,

BRIAN J. KUESTER
United States Attorney

s/ D. Edward Snow
D. Edward Snow, OBA # 16439
Assistant United States Attorney
520 Denison Avenue
Muskogee, Oklahoma 74401
(918) 684-5100 (Telephone)

**s/** Sarah McAmis
SARAH McAMIS, OBA # 15903
Assistant United States Attorney
520 Denison Avenue
Muskogee, Oklahoma 74401
Telephone: (918) 684-5100

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of May 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Warren Gotcher - Attorney for the Defendant.

D. Edward Snow
Assistant United States Attorney

22