## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| *Plaintiff/Respondent,* | **Crim. Case No. 17-CR-79-RAW** |
| **v.** | **Civil Case No. 23-CV-219-RAW** |
| **HENRI MICHELLE PIETTE,** | |
| *Defendant/Movant.* | |

## GOVERNMENT'S BRIEF IN OPPOSITION
## TO DEFENDANT'S § 2255 MOTION

Respectfully submitted,

CHRISTOPHER J. WILSON
Acting United States Attorney

*/s/ Linda A. Epperley*
Linda A. Epperley, OBA No. 12057
Assistant United States Attorney
520 Denison Avenue
Muskogee, Oklahoma 74401
Telephone: (918) 684-5156
Facsimile: (918) 684-5150
linda.epperley@usdoj.gov

November 27, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………………...…....ii-vi

GOVERNMENT'S OBJECTION TO § 2255……………………………..…………….....…...1

FACTUAL & PROCEDURAL HISTORY…………………………………………………......1

ARGUMENT & AUTHORITIES…………………………………………………………11

    I.      DEFENDANT'S CLAIMS ARE PROCEDURALLY BARRED………………12

        A.  Relitigation Bar………………………………………………..………..12

        B.  Procedural Bar………………………………………………………...13

    II.  DEFENDANT CANNOT ESTABLISH INEFFECTIVE ASSISTANCE
        OF COUNSEL…………………………………………………………………14

        A.  The *Strickland* Standard for Ineffective Assistance of Counsel Claims………14

            1.  The Deficiency Inquiry……………………………………………...15

            2.  The Prejudice Inquiry……………………………………..……...16

        B.  The *Strickland* Standard Applies to Defendant's Claimed Errors………..……16

            1.  Counsel's Alleged Failure to "bring in any witnesses from Mexico"…......17

            2.  Alleged Failure to Provide Discovery and Prepare for Trial……………...18

            3.  Alleged Claim of False Diagnosis…………………………………19

            4.  Alleged Violation of the Attorney Client Privilege…………………………19

            5.  Alleged Withholding of Evidence………………………………………20

    III. THE COURT MAY PROPERLY OVERRULE DEFENDANT'S MOTION
        WITHOUT AN EVIDENTIARY HEARING………………………………………22

CONCLUSION…………………………………………………………………..……………22

# TABLE OF AUTHORITIES

**Cases**

*Boyd v. Ward*,
179 F.3d 904 (10th Cir. 1999) ................................................................ 15

*Daniels v. United States*,
254 F.3d 1180 (10th Cir.2001) ........................................................... 18, 20

*Drake v. City of Fort Collins*,
927 F.2d 1156 (10th Cir. 1991) ............................................................. 17

*Foster v. Chatman*,
578 U.S. 48 (2016) ................................................................................ 12

*Hall v. Bellmon*,
935 F.2d 1106 (10th Cir. 1991) ............................................................. 17

*Hatch v. Oklahoma*,
58 F.3d 1447 (10th Cir.1995) ............................................................ 18, 20

*Knowles v. Mirzayance*,
129 S.Ct. 1411 (2009) ........................................................................... 15

*Lafler v. Cooper*,
132 S.Ct. 1376 (2012) ........................................................................... 16

*Massaro v. United States*,
538 U.S. 500 (2003) .............................................................................. 13

*Missouri v. Frye*,
132 S.Ct. 1399 (2012) ........................................................................... 16

*Murray v. Carrier*,
477 U.S. 478 (1986) .............................................................................. 13

*Romano v. Gibson*,
239 F.3d 1156 (10th Cir. 2001) ............................................................. 15

*Smith v. Robbins*,
528 U.S. 259 (2000) .............................................................................. 14

*Strickland v. Washington*,
466 U.S. 668 (1984) ..................................................................... 14, 15, 16

*United States v. Addonizio,*
442 U.S. 178 (1979) ........................................................................... 12

*United States v. Apperson*
 441 F.3d 1162 (10th Cir. 2006) ....................................................... 19

*United States v. Barboa,*
777 F.2d 1420 (10th Cir. 1985) ....................................................... 22

*United States v. Frady,*
456 U.S. 152 (1982) ........................................................................... 13

*United States v. Johnson,*
749 Fed. Appx. 750 (10th Cir. 2019) ............................................. 13

*United States v. Kennedy,*
225 F.3d 1187 (10th Cir. 2000) ....................................................... 15

*United States v. Piette,*
119 F.4th 1142 (10th Cir. 2022) ............................................. 5, 9, 10

*United States v. Rodriguez-Hernandez,*
10 Fed. Appx. 717 (10th Cir. 2001) .......................................... 13, 17

*United States v. Scott,*
7 F.3d 1046 (10th Cir. 1993) ........................................................... 17

*United States v. Snyder,*
871 F.3d 1122 (10th Cir. 2017) ....................................................... 13

*United States v. Williams,*
948 F.Supp. 956 (D.Kan. 1996) ...................................................... 15

*United States v. Wiseman,*
297 F.3d 975 (10th Cir. 2002) ......................................................... 13

**Statutes**

18 U.S.C. § 1201(a)(1) ............................................................................................... 5

18 U.S.C. § 1201(g) ..................................................................................................... 5

18 U.S.C. § 2423(b) ................................................................................................ 5, 10

28 U.S.C. §2255(b) ..................................................................................................... 22

28 U.S.C. § 2255 ......................................................................................................... 10

**Other Authorities**

Federal Rule of Evidence 404(b) ................................................................................. 7

U.S.S.G. § 5E1.1 .......................................................................................................... 8

U.S.S.G. § 5E1.2(c)(3) ................................................................................................. 8

<u>**GOVERNMENT'S OBJECTION TO §2255 MOTION**</u>

COMES NOW the Plaintiff/Respondent, United States of America, by and through Christopher J. Wilson, United States Attorney for the Eastern District of Oklahoma, and Linda A. Epperley, Assistant United States Attorney, and respectfully opposes Defendant's pro se "Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody" ("Motion"). (Doc. #372; Dkt. #1).[1] For the reasons stated herein, Defendant's Motion is without merit and should be dismissed.

<u>**FACTUAL & PROCEDURAL HISTORY**</u>

The Tenth Circuit Court of Appeals set out the sordid history of this case as follows:

> The following account is based on trial testimony. Rosalynn McGinnis was born in 1984. In the early 1990s, McGinnis lived in Springfield, Missouri, with her parents, Gayla and Michael, and several siblings. One day, while playing at the park, the McGinnis children met Henri Piette's children. The kids became close, bonding over sleepovers, movies, meals, and time spent on Piette's trampoline.
>
> Piette first molested McGinnis at one of these sleepovers. She was nine. At first, she thought it was a "bad dream," but soon she realized that it was far too detailed to have been a dream. Gayla had not believed McGinnis when she was previously molested by her half-brother, so McGinnis did not tell anyone about what Piette did.
>
> McGinnis was not Piette's only victim in Springfield. One of Piette's sons, Tobias Piette, testified that he saw Piette molest several other children while they lived there. One day, he walked in on Piette giving an eight-year-old girl a shower and touching her vagina. Another time, he saw Piette giving a different young girl a driving lesson; he groped her butt while she sat on his lap.
>
> As the McGinnis and Piette children got to know each other better, so did Gayla McGinnis and Henri Piette. They discussed Gayla's interest in religion and the Church of Jesus Christ of Latter-day Saints. Piette gradually drove Gayla away from her husband

---

[1] Documents in this criminal case 17-CR-79-RAW will be referenced as "Doc.". Filings made in associated civil case number 23-CV-219-RAW will be referred to as "Dkt."

1

Michael, who did not share her interest in these topics and was often away from home. Soon, Michael left Gayla and the children entirely. "Almost immediately," McGinnis's brother testified, it was as if Piette "had stepped into [Michael's] shoes."

But Piette ran a very different kind of home. He read Bible passages to the children constantly. He encouraged Gayla to physically discipline the children. He started separating the children and imposed something "almost like a hierarchy system." He beat Gayla "countless" times. He also beat the children. After one of Piette's beatings drew the attention of authorities, Piette convinced Gayla that she would be blamed for it, and they took the family on the road. They moved on an almost daily basis, passing through Arizona, Oregon, Utah, California, Montana, Missouri, Texas, Oklahoma, and Guatemala. Piette forced the others to beg for money. They lived in a tent. Piette gave McGinnis beer and molested her daily.

Piette, Gayla, and the children settled in Wagoner, Oklahoma. There, Piette escalated his physical, sexual, and psychological abuse. He hit the children with two-by-fours when they said "hanged" instead of "hung." He punched Gayla in the face. He raped McGinnis. She was eleven. Finally, Gayla escaped to her mother's home in Independence, Missouri, and took her children with her. A few weeks later, Piette went to Independence and took them back.

When they returned to Wagoner, Piette addressed his "sin" with McGinnis by marrying her in a secret ceremony officiated by Piette's son Tobias. Piette also married Gayla around this time. The sexual abuse of McGinnis continued unabated. Piette performed oral sex on McGinnis and penetrated her vagina daily with his penis and fingers. She was twelve. After a run-in with Child Protective Services, McGinnis and her family landed in a domestic violence shelter in Poteau, Oklahoma, away from Piette. McGinnis briefly attended middle school in Poteau.

On January 31, 1997, McGinnis went to school in Poteau and did not come home. Piette visited her on the playground that day. He told McGinnis that he loved her and that he would reunite their family. He told her to look for "signs." Later that day, McGinnis noticed a sombrero and a poncho inside a school building; she recognized them from a trip to Mexico with Piette. She ran outside the school and saw Tobias Piette in a truck; he took her to Tulsa, where they met up with Piette and Piette's other children. When McGinnis asked about the rest of her family, Piette told her there was not enough time to get her brothers and that Gayla "wasn't

coming back.". He introduced McGinnis to his children as "their new mother." McGinnis was horrified.

McGinnis did not attend school after the sixth grade. Piette moved McGinnis and his children around the country several times, taking advantage of benefits provided by the Church of Jesus Christ of Latter-day Saints, and avoiding detection by using false names and changing McGinnis's appearance. Everyone was drilled on what to say if people started asking questions. Piette forced McGinnis to write letters to relatives, the media, and law enforcement, saying that she ran away from her "crazy" mother and "no good" family. If she misspelled a word she was hit. In reality, Gayla diligently searched for McGinnis.

Piette continued subjecting McGinnis to constant physical and sexual violence. He raped her "[t]hree times a day, maybe more.". Shortly before McGinnis turned thirteen, while living in Oklahoma City, she became pregnant for the first time. She had a miscarriage and Piette told her to flush it down the toilet. Piette started giving McGinnis crack cocaine and beat her more frequently. Then, while living in Idaho, McGinnis became pregnant again. This time, she was fourteen. Piette moved the family to Mexico to avoid questions about her pregnancy, but when Piette brought McGinnis to the hospital the doctors said it was too soon to deliver the baby. Piette disagreed. He used a pocketknife to deliver the baby on the floor of a van. At the time, they were "living in an abandoned trailer that was on a piece of land that had no electricity, no water, had holes in the floors and was infested with bed bugs."

Over the next sixteen years, Piette moved the family around Mexico and Guatemala, rarely spending more than a few months in any one location, though they would take occasional trips back to the United States. McGinnis delivered eight more of Piette's children. These children did not go to school, socialize, or even learn how to read. They were isolated from others. Piette tried to prevent them from learning where they were living. The children were also neglected. One of the boys had a single pair of shorts that he kept on his body with a rope. One of the girls almost drowned in a bucket of water. Piette hung her upside down to shake the water out and she recovered. The family's lifestyle consisted of "begging on the streets and living from place to place." Sometimes, McGinnis sold ice cream and other foods. Other times, Piette would make racist comments to provoke the locals into fighting McGinnis for money. Whatever the source, all money went to Piette. He spent it on drugs and alcohol, which he also abused.

Years passed, and Piette's brutality continued. McGinnis testified that there was never a time that Piette was not beating her. He would sometimes tie McGinnis to a bed or chain her to a pole for days. She testified that she has scars all over her face, has had both her arms broken, has been stabbed and shot, suffers chronic pain, and needed throat surgery to be able to speak. Piette would also terrorize their children, hitting them with two-by-fours, bats, rocks, pans, pickaxes, glass bottles, fruit, and "[a]nything that was in reach." He would beat the children to the point of unconsciousness and then tell them that he loved them. "[I]t just surprised me how close I can get to dying without dying," McGinnis's firstborn testified.

Piette also started molesting the children McGinnis delivered. Ma.P., Piette's first daughter with McGinnis, testified at trial that when she was around five years old, Piette asked her to stand against the wall, pull down her underwear, and show him her vagina. Although McGinnis did not know exactly what was happening with her daughter, she was suspicious. Piette complimented and touched Ma.P.'s vagina more frequently as she got older. He made Ma.P. dance naked and gave her alcohol and drugs while he molested her. He put his mouth on her chest and her vagina. He made her touch and put her mouth on his penis, and he ejaculated in her mouth. When she was seven or eight years old, Piette started putting objects in Ma.P.'s vagina, such as frozen hot dogs and drumsticks. He would punish her by cutting up chilis and rubbing chili juice on his fingers, then placing them in her vagina. Piette also started putting his penis in her vagina. When she resisted, Piette told her he would either molest her or one of her sisters. One time, Ma.P. saw Piette molesting her younger sister, A.P., who was crying; Ma.P. was forced to put her mouth on Piette's penis so he would leave A.P. alone.

A.P. also testified about Piette's sexual abuse. According to A.P., Piette started touching her vagina when she was around seven years old and continued to molest her every few days. She often woke up to Piette touching her vagina. Piette forced A.P. to masturbate his penis and ejaculated in her mouth. One time, A.P. and her younger brother saw Piette performing oral sex on Ma.P. A.P. and Ma.P. never talked about their shared experience of sexual trauma and abuse.

Sometimes, McGinnis would travel back into the United States by herself to beg for money. Other times, Piette was incarcerated, and McGinnis helped him get out of jail. McGinnis also purchased several guns and carried a gun at times, although she

testified it belonged to Piette. But Piette told McGinnis that he would kill the children, and then her, if she ever left him. He also told her that, if she got the police involved, nobody would ever believe her. That he would kill her. That her family did not want her back. That "he was the only one that would ever care for" her. And that she "was to do exactly what he told [her] to do or else." On direct examination, McGinnis defined "or else" as Piette killing her and her children. McGinnis further testified that she did not take advantage of any potential opportunity to harm Piette because she "knew that if [she] didn't kill him with the first shot or knife stab, if there was any way that he would survive, he would kill [her] and every one of [her] children." Even had she managed to kill him, she testified that she believed she would be imprisoned for life and her children all sold into slavery. On the other hand, Piette introduced testimony from his father that he and McGinnis appeared to have a "very happy family."

Notwithstanding the fear that Piette's threats instilled in her, McGinnis made several attempts to escape. Once, alone with her children in an Arizona motel room, she called a women's crisis shelter, but Piette returned before the shelter could assist her. Another time, McGinnis took her children to Piette's son Mikey's house. Piette quickly arrived, dragged McGinnis out by her hair, and beat her. One of Piette's children with McGinnis managed to escape and, although a knife fight ensued, Piette did not kill him.

In 2016, McGinnis saved up $150 over the course of several months—hiding it by a hill to avoid Piette's detection—and waited until Piette, who had been in and out of rehab, was passed out drunk. Then she took her children, found a taxi, and hid in a nearby town. McGinnis and eight of her children—one of her sons had already escaped—made their way to an American Consulate. They returned to the United States and settled in Kansas City, Missouri.

*United States v. Piette*, 119 F.4th 1142, 1147-1151 (10th Cir. 2022) (internal citations omitted).

On December 13, 2017, an Eastern District of Oklahoma grand jury returned a two-count Indictment charging Henri Piette (hereinafter "Defendant") with one count of Kidnapping in violation of 18 U.S.C. §§ 1201(a)(1) & 1201(g), and one count of Travel with Intent to Engage in Sexual Act with a Juvenile in violation of 18 U.S.C. § 2423(b). (*Indictment*, Doc. #3). The Federal Public Defender's Office was appointed to represent him. (*Order*, Doc. #15; *Entry of Appearance*,

Doc. # 12).

Defendant appeared with counsel Robert S. Williams for arraignment on January 16, 2018, before Magistrate Judge Kimberly West. (*Minute Sheet*, Doc. #13). Defendant acknowledged his receipt of the Indictment and stated he had been given an opportunity to discuss it with his counsel. (*Id.*). Defendant was also advised of his constitutional rights, the charges against him, and the possible penalties. (*Id.*). Defendant then entered a plea of not guilty as to Counts 1 & 2. (*Id.*).

In May, 2018, Defendant filed a pro se motion seeking new counsel, which this Court granted. (*Letter*, Doc. #35; *Order*, Doc. #38). Mr. Warren Gotcher then entered his appearance as counsel for Defendant. (*Entry of Appearance*, Doc. #41).

On November 19, 2019, Defendant appeared with Mr. Gotcher before this Court for a competency hearing. (*Minute Sheet*, Doc. #93). The Court addressed the Medical Evaluation prepared in anticipation of the hearing. (*Sealed Evaluation*, Doc. #79). The Court inquired and both parties stipulated to the contents of the Evaluation and noted they had no additional evidence to offer for purposes of the hearing. (*Minute Sheet*, Doc. #93). The Court determined Defendant was not presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he was unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. (*Id.*; *Order*, Doc. #94).

Prior to trial, Mr. Gotcher filed a motion requesting permission to take depositions. In pertinent part, the motion sought the following:

> That the Defendant requests an order by this court to take the deposition of Julie Cruz Lopez. The prospective witness lives in Mexico and has no visa or passport to travel to the United States for a trial. That the prospective witness is willing to be deposed. That the nature of her testimony would be evidence that would indicate that through conversations with the Defendant and his wife Rosalynn, the alleged victim, and the actions of both Rosalynn and the Defendant that the alleged victim was not kidnaped. That this

> evidence was obtained through the efforts of the investigator, Eric Cullen. That this evidence is vital and necessary to refute the government's allegations of kidnaping, and is necessary for the defense of Henri Michelle Piette.

(*Motion*, Doc. 124, at 1-2).  The Court denied the motion, stating "Defendant has provided no details or evidence to support any exceptional circumstances in this matter." (*Order*, Doc. #128).

A motion in limine was filed by Mr. Gotcher requesting a *Daubert/Kumho* hearing to determine the reliability of expert testimony and following the hearing, to prevent the testimony of Joann Behrman-Lippert, Ph.D.  (*Motion*, Doc. #145).  The motion also requested the district court determine if there is a threshold of reliability to allow the testimony of DNA expert.  (*Id.*). The Court determined the motion would be deferred until trial and if necessary, a *Daubert* hearing would be conducted.  (*Order*, Doc. #176).

Mr. Gotcher also filed a motion requesting notice of any evidence to be offered under Federal Rule of Evidence (FRE) 404(b) and a motion in limine seeking exclusion of any evidence of other molestations.  (*Motion*, Doc. #126; *Motion*, Doc. #151).  The district court determined the evidence submitted under FRE 404(b) was admissible to show motive and plan and denied the motion in limine regarding alleged acts of sexual abuse.  (*Order*, Doc. #176).

Mr. Gotcher filed a motion to dismiss Counts 1 and 2, arguing the crimes alleged had expired based on the statute of limitations.  (*Motion*, Doc. #129).  The district court stated "[a]lthough premature in this technical sense, defendant properly filed the motion and the court appreciates notice of a complicated issue. The court will deny the present motion, but defendant may re-urge the issue at the conclusion of the government's case-in-chief." (*Order*, Doc. #140).

During the Pre-Trial Conference held on May 23, 2019, the district court heard argument about other crimes, including molestation evidence. (*Sealed PT Conf. Tr.* 17-27). Although the motion in limine addressed only molestation evidence, Defendant's argument also sought to

7

exclude evidence of physical abuse as irrelevant to the crimes charged. (*Sealed PT Conf*. Tr. 18-19).

On October 17, 2019, after a seven-day trial, a jury found Defendant guilty on both counts. (*Verdict*, Doc. #200).

The final Presentence Investigation Report was filed on January 7, 2020, which calculated Defendant's advisory sentencing range under the 2018 Guidelines. (*PSR*, Doc. #217, at ¶42). An offense level of 43, combined with a Category I criminal history, yielded an advisory guideline imprisonment range of life. (*Id*., at ¶¶63-64, 86). The PSR also determined the fine range to be between $50,000 to $250,000, pursuant to U.S.S.G. § 5E1.2(c)(3). (*Id*., at ¶95). Pursuant to U.S.S.G. § 5E1.1, restitution to the victim was determined to be $50,067.00. (*Id*., at ¶¶96-97).

Mr. Gotcher then filed motion for downward variance. (Motion, Doc. #218). In his motion, Mr. Gotcher asked the Court to "consider this man's age and health, and craft a sentence with leniency." (*Id.*, at 5). The Government responded in opposition. (*Response*, Doc. #220).

Mr. Gotcher simultaneously filed a motion to withdraw as counsel for Defendant, stating in pertinent part:

> That Client has asserted that the conviction was the fault of Counsel in that Counsel committed many errors that resulted in Defendant's conviction. While Counsel has asserted to Client that Counsel does believe that Counsel was professionally adequate in Counsel's representation, it appears that there has arisen an irreparable conflict between the Defendant and counsel that would undermine the appellate process, and that client would not trust any matter asserted in the appellate process.

(*Motion*, Doc. #219, 1-2).

On February 20, 2020, Defendant appeared with Mr. Gotcher for sentencing proceedings. (*Minute Sheet – Sentencing*, Doc. #223). As a preliminary matter, the Court entered "Court Exhibit 1", which was a "three-and-a-half-inch thick binder" of "all the letters that the Court and the United

States Probation Office received from the defendant to-date, but some of which have been filed and some of which have not been." (Sent. Tr., at 5). Regarding the motion to withdraw, the Court explained Mr. Gotcher would remain as Defendant's attorney through the sentencing and insure Defendant's pro se notice of appeal was timely filed. (Sent. Tr. at 3-6). The Court also addressed the pertinent points in evaluating a request for self-representation:

> THE COURT: All right. Thank you. Moving to the -- the letters are made exhibits for the reason that they both support and contrast or somewhat vitiate the request for new counsel. At some points in time Mr. Piette expressed vast disagreement with counsel and at other times Mr. Piette thought Mr. Gotcher was the best thing since sliced bread. So there is conflicting evidence whether there has been a complete breakdown of the attorney/client relationship, but the Court will err on the side of giving Mr. Piette new counsel for appeal purposes.

(Sent. Tr. 6).

The Court addressed Mr. Gotcher's three objections to the PSR and subsequently overruled them. (Sent. Tr., at 7-11). It also heard argument on the motion for downward departure and, after noting the authority to vary from the advisory sentencing range, denied the motion. (Id., at 11-13). Defendant was given the opportunity to address the Court and proceeded to speak at great length on a myriad of topics. (Id., at 16-43).

Following Defendant's narration, he was sentenced to life imprisonment with five years' supervised release on Count One, plus 360 months' imprisonment with five years' supervised release on Count Two, to run concurrently. (*Minute Sheet – Sentencing*, Doc. #223; *Judgment*, Doc. #226). Defendant was also ordered to pay $50,067.00 to McGinnis. (*Id.*)

Defendant filed a direct appeal. *United States v. Piette*, 119 F.4th 1142 (10th Cir. 2022). Defendant was represented on appeal by Mr. Barry Derryberry from the Federal Public Defenders

Office. (*Attorney Appearance*, Doc. #232).[2]  Defendant advanced three arguments to attack his conviction and one challenge to his sentencing hearing.  First, Defendant argued the district court abused its discretion by admitting evidence that Defendant molested two of his daughters and one neighborhood girl some years before meeting McGinnis.  Defendant next argued the district court erred in denying his motion to dismiss the § 2423(b) traveling-with-intent charge, on statute of limitations grounds.  Third, Defendant appealed whether the district court properly instructed the jury regarding a special interrogatory on the affirmative defense to the kidnapping count.  Finally, Defendant alleged on appeal that he asked, and should have been allowed, to represent himself at sentencing.  In a 42-page published opinion, the Tenth Circuit ruled as follows:

> We AFFIRM Piette's traveling-with-intent conviction, REVERSE Piette's kidnapping conviction, reject Piette's constitutional attack on his sentencing, and REMAND for further proceedings consistent with this opinion.

*United States v. Piette*, 119 F.4th 1142, 1166 (10th Cir. 2022) (internal citations omitted).

Defendant's case was remanded to the district court, wherein an amended judgment was entered on January 24, 2023.  (*Amended Judgment*, Doc. #345).  Defendant was sentenced to 360 months' imprisonment with five years' supervised release on Count Two.  (Id.).  Count One was dismissed.  (*Id.*; *Motion*, Doc. #342; *Order*, Doc. #343).  Defendant was also ordered to pay $50,067.00 to McGinnis.  (*Id.*).

On August 2, 2023, Defendant filed his current "Sealed Amended Motion", pursuant to 28 U.S.C. § 2255.  (*Sealed Motion*, Doc. #372).  on August 9, 2023, this Court directed the Federal

---

[2] Despite his case being on appeal and being represented by counsel, Defendant continued to file numerous pro so handwritten letters, affidavits, and motions for miscellaneous relief with the district court.  (Docs. #257-258; 260; 262- 263; 265-266; 268; 270; 272-278; 280; 282; 284-286; 288; 290-292; 294-295; 297; 299-304; 306; 308-311; 313-317; 318; 320; 322-325; 327-331; 334-335; 338; 341).

Public Defender to provide the name of a private attorney to assist Defendant in connection with the § 2255 motion. (*Order*, Doc. #375; *Appearance*, Doc. #378). Defendant was subsequently transferred to state custody on a writ and is currently being detained by state authorities while he is prosecuted in Wagoner County district court.[3] This Court has since appointed Mr. Mike Abel as defense counsel, "for the time-period that defendant is located within the State of Oklahoma." (*Minute Order*, Doc. #384). For the reasons set forth below, Defendant's Motion should be dismissed.

## ARGUMENT & AUTHORITIES

Defendant alleges that several inactions by his court appointed trial attorney, arise to the level of ineffective assistance of counsel.[4] For instance, he claims counsel failed to file a federal subpoena to bring in witnesses from Mexico, failed to prepare him for trial, allowed the prosecutor to lead witnesses, worked with Dr. DeMisa, Ph.D. to falsely "diagnosis" him, allowed the "police investigator" to file a false police report "to obtain a grand jury indictment on a felony", and failed to present evidence showing Defendant's "victim was not being held captive, but was a wanted fugitive." (*Motion*, Doc. #372, at 6-8).

Defendant also attempts to create due process claims by alleging the FBI withheld evidence it obtained in Mexico, a case investigator testified against [him] for 45 minutes obviously colluding with the prosecutor", and the "indictment is fruit of the poisoned tree." (*Motion*, Doc. #372, at 6-8, 16). Construing Defendant's claims liberally, he has not established any entitlement to relief.

---

[3] *State of Oklahoma v. Henri Piette*, CF-2017-00577. See https://www.oscn.net/dockets/GetCaseInformation.aspx?db=wagoner&number=CF-2017-00577&cmid=321735 (last accessed September 27, 2023).

[4] Throughout his 17-page motion, Defendant does not identify which of his court appointed attorneys are the focus of his the claims of ineffectiveness.

I.    **DEFENDANT'S CLAIMS ARE PROCEDURALLY BARRED.**

A.    **Relitigation Bar**

"[A]s a general rule, federal prisoners may not use a motion under 28 U.S.C. § 2255 to relitigate a claim that was previously rejected on direct appeal." *Foster v. Chatman*, 578 U.S. 48 (2016). Instead, relief under § 2255 is generally confined to situations where (a) the "convictions and sentences [were] entered by a court without jurisdiction," (b) the sentence imposed was outside of the statutory limits, (c) a constitutional error occurred, or (d) a non-constitutional error of law or an error of fact occurred that constituted a fundamental defect which inherently resulted in a complete miscarriage of justice, i.e., that rendered the entire proceeding irregular and invalid. *United States v. Addonizio*, 442 U.S. 178 (1979).

In this case, Defendant alleges that, through the ineffectiveness of counsel, the "victim was never held captive" and there was "absolutely no proof of travel for sex." (*Motion*, Doc. #372, at 9-10, 17). Defendant makes the following inauspicious statements:

- "the victim was held in U.S. custody in Federal holding and charged w/ human trafficing [sic] At [sic] the same time she claimed to be held captive." (*Motion*, Doc. #372, at 9-10);

- "[h]ad the jury known that the victim was not being held captive but was a wanted fugitive. The judgment would have been different." (*Id*.); and

- "[O]n the day that victim claimed to have escaped captivity And [sic] left Piette 'At home drunk on A couch', Piette was in prison in Mexico And [sic] had been for 3 months." (*Id*.).

These claims are barred. On direct appeal, Defendant argued the district court erred in denying his motion to dismiss the § 2423(b) traveling-with-intent charge and instructing the jury regarding a special interrogatory on the kidnapping count. Defendant's attempt to relitigate the issues are thus barred.

12

B. **Procedural Bar**

Claims not raised on direct appeal are typically barred on collateral review unless the petitioner shows cause and prejudice. *See Massaro v. United States*, 538 U.S. 500 (2003). "The procedural-default rule is neither a statutory nor a constitutional requirement, but it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments." *Id.* The general rule is that a court cannot entertain a procedurally defaulted claim on the merits unless the defendant can excuse his default by showing either (i) cause and actual prejudice, or (ii) actual innocence. "Cause" exists when a factor external to the defense prevented counsel from raising a claim at the appropriate juncture. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). A petitioner can establish cause by showing that defense counsel provided constitutionally ineffective assistance. *United States v. Wiseman*, 297 F.3d 975 (10th Cir. 2002). To demonstrate prejudice, a petitioner must show that the claimed error "worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimension." *United States v. Snyder*, 871 F.3d 1122, 1127-28 (citing *United States v. Frady*, 456 U.S. 152, 170 (1982)).

Defendant alleges the FBI failed to disclose information obtained in Mexico during discovery, the "indictment is fruit of the poisoned tree", "Tobias Allen Piette, gave false statements to the F.B.I.", the "case investigator testified against [Defendant] for 45 minutes obviously colluding with the prosecutor." (*Motion*, Doc. #372, at 5-6, 8-10, 17).

Defendant's claims masked as ineffective assistance of counsel against Mr. Gotcher are procedurally barred, as Defendant failed to raise them on appeal. *See United States v. Johnson*, 749 Fed. Appx. 750 (10th Cir. 2019). Instead, Defendant makes conclusory allegations that have no basis in fact. *See Rodriguez-Hernandez*, 10 Fed. Appx. at 719 (dismissing ineffective assistance

13

claims because petitioner offered no facts to support this bare assertion and noting that while it is well settled that courts must construe pro se pleadings broadly, we will not attempt to create an argument for the [petitioner] in the absence of any discussion of the issues.)(internal citations omitted).

Because Defendant was found guilty, he cannot make any showing of actual innocence, though he attempts to do so by blaming his victim. He further argues that factors external to his defense – the ineffectiveness of his appointed counsel – excused his default. However, for the reasons set forth below, those arguments are without merit. Nor has he demonstrated that a fundamental miscarriage of justice would result from the application of the procedural bar.

## II. DEFENDANT CANNOT ESTABLISH INEFFECTIVE ASSISTANCE OF COUNSEL.

### A. THE *STRICKLAND* STANDARD FOR INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS.

To prevail on a claim of ineffective assistance of counsel,

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defendant. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or [] sentence resulted from a breakdown in the adversarial process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687-688 (1984).

This is a conjunctive test requiring Defendant to prove both elements before he is entitled to relief. The Court, however, is not required to address the elements in any particular order. *Id.* at 697. *See also Smith v. Robbins*, 528 U.S. 259, 286 n. 14 (2000) ("The performance component need not be addressed first. If it is easier to dispose of an ineffectiveness claim on the ground of

lack of sufficient prejudice, which we expect will often be so, that course should be followed.")

(quoting *Strickland*); *Romano v. Gibson*, 239 F.3d 1156, 1181 (10th Cir. 2001) ("This Court can

affirm the denial of habeas relief on whichever Strickland prong is easier to resolve.").  Further,

"[t]here is a strong presumption that counsel provided effective assistance, and a section 2255

defendant has the burden of proof to overcome that presumption."  *United States v. Kennedy*, 225

F.3d 1187, 1196 (10th Cir. 2000) (*quoting United States v. Williams*, 948 F.Supp. 956, 960 (D.Kan.

1996), *cert. denied*, 522 U.S. 1033, 118 S.Ct. 636, 139 L.Ed.2d 615 (1997)).  *See also, Knowles v.*

*Mirzayance*, 129 S.Ct. 1411, 1420 (2009).

### 1.  *The Deficiency Inquiry.*

Evaluation of an ineffective assistance claim is a fact intensive inquiry, requiring the court

to determine "whether counsel's assistance was reasonable considering all the circumstances."

*Strickland*, 466 U.S. at 688 (emphasis added).  As the Supreme Court explained in *Strickland*,

"representation is an art, and an act or omission that is unprofessional in one case may be sound

or even brilliant in another."  *Id.* at 693.  Further, a court must give great deference to defense

counsel's reasoned choice of action.

> It is all too tempting for a defendant to second-guess counsel's
> assistance after conviction or adverse sentence, and it is all too easy
> for a court, examining counsel's defense after it has proved
> unsuccessful, to conclude that a particular act or omission of counsel
> was unreasonable. A fair assessment of attorney performance
> requires that every effort be made to eliminate the distorting effects
> of hindsight, to reconstruct the circumstances of counsel's
> challenged conduct, and to evaluate the conduct from counsel's
> perspective at the time. Because of the difficulties inherent in
> making the evaluation, a court must indulge in a strong presumption
> that counsel's conduct falls within the wide range of reasonable
> professional assistance: that is, the defendant must overcome the
> presumption that, under the circumstances, the challenged action
> might be considered sound trial strategy.

*Id.* at 689 (internal citations omitted).  *See also Boyd v. Ward*, 179 F.3d 904, 915 (10th Cir. 1999)

("[T]hose accused of crimes, even capital crimes, are entitled only to a reasonable and adequate defense, not the defense which, in hindsight, they believe would have been best."). In the plea context, counsel renders deficient performance if he fails to timely advise his client of a "formal plea offer," *Missouri v. Frye*, 566 U.S. 134, 144 (2012), or if he provides legally incorrect or unreasonable advice about whether to accept the plea offer, *Lafler v. Cooper*, 132 S.Ct. 1376, 1387 (2012).

### 2. The Prejudice Inquiry.

The party claiming ineffective assistance bears a heavy burden of proving that the claimed errors actually had an adverse effect. Defendant must show more than "that the errors had some conceivable effect on the outcome of the proceedings [as] [v]irtually every act or omission would meet that test." *Strickland*, 466 U.S. at 693. The reason for such a heightened burden of proof is that "the presumption that a criminal judgment is final is at its strongest in collateral attacks on the judgment." *Id.* at 697.

Defendant is required to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

### B. THE STRICKLAND STANDARD APPLIED TO DEFENDANT'S CLAIMED ERRORS.

Defendant's meandering Motion alleges several ungrounded instances of ineffective assistance of counsel by his court appointed attorney. However, he does not name any specific attorney throughout the entirety of the motion, merely lodging his complaints against, "Attorney" or "the defense Attorney".[5] Regardless, the  conclusory allegations, which are unsupported by

---

[5] Defendant was represented by Mr. Robert Williams at the time of arraignment, Mr. Warren Gotcher was counsel through trial proceedings, and Mr. Barry Derryberry was counsel on appeal.

either fact or legal authority, are insufficient to establish ineffective assistance. *See United States v. Rodriguez-Hernandez*, 10 Fed. Appx. 717, 719 (10th Cir. 2001)(dismissing ineffective assistance claims because petitioner offered "no facts to support this bare assertion" and noting that "while it is well settled that courts must construe pro se pleadings broadly, we will not attempt to create an argument for the [petitioner] in the absence of any discussion of the issues.")(citing *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991)); *United States v. Scott*, 7 F.3d 1046 (10th Cir. 1993) (unpublished table opinion) ("Although we construe a pro se litigant's pleadings liberally, he is not relieved of the burden of alleging sufficient facts on which a recognized legal claim could be based.  Because Defendant's . . . claims of ineffective assistance consist of merely conclusory allegations, the district court properly dismissed them.") (*citing Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)).  For the reasons herein, Defendant's claims against his counsel at the trial level do not amount to ineffective assistance of counsel pursuant to *Strickland*.

### 1.  Counsel's Alleged Failure to "bring in any witnesses from Mexico".

Defendant claims counsel "[f]ailed to bring in Any witnesses from Mexico. They were willing to testify but my Attorney Failed to File Any Federal subpoena. [sic]"  (*Motion*, Doc. #372, at 6).  While Defendant makes reference to the "Mexican police, the Mayor, and child protective services in Santa Maria Tonamecca" (*Id*. at 15) he does not state who the witnesses are or how they would have changed the outcome of the trial.  Defendant's claim lacks merit and is contrary to the record.

Prior to trial, Mr. Gotcher filed a motion requesting permission to take depositions. In pertinent part, the motion sought the following:

> That the Defendant requests an order by this court to take the deposition of Julie Cruz Lopez. The prospective witness lives in Mexico and has no visa or passport to travel to the United States for a trial. That the prospective witness is willing to be deposed. That

the nature of her testimony would be evidence that would indicate that through conversations with the Defendant and his wife Rosalynn, the alleged victim, and the actions of both Rosalynn and the Defendant that the alleged victim was not kidnaped. That this evidence was obtained through the efforts of the investigator, Eric Cullen. That this evidence is vital and necessary to refute the government's allegations of kidnaping, and is necessary for the defense of Henri Michelle Piette.

(*Motion*, Doc. 124, at 1-2). The Court denied the motion. (*Order*, Doc. #128).

Despite the Order, on behalf of Defendant, Mr. Gotcher renewed the motion. (*Motion*, Doc. #155, at 1-2). Again the motion was denied. (*Order*, Doc. #128).

### 2. *Alleged Failure to Provide Discovery and Prepare for Trial.*

Defendant alleges "Attorney Failed [sic] to provide me with discovery, Failed [sic] to prepare me for trial And Allowed [sic] the prosecutor to lead the witnesses without objecting." (*Motion*, Doc. #6). He further claims, "Attorney's case investigator testified Against [sic] me for 45 minutes obviously colluding with the prosecution." (*Id*.). In doing so, Defendant fails to identify which of his counsel are addressed by these claims. He further fails to identify what portions of the discovery he should have been shown, what aspect of trial he was prepared for, what leading question in the seven-day trial the prosecutor supposedly asked, what objection his attorney should have stated, or what portion of the "case investigator['s]" testimony established collusion. The claims are unsubstantiated and are without merit. Generally, courts will not consider conclusory allegations not substantiated with factual and legal support. It is Defendant's burden to "allege facts which, if prove[n], would entitle him to relief." *Hatch v. Oklahoma*, 58 F.3d 1447, 1471 (10th Cir.1995), overruled in part on other grounds by *Daniels v. United States*, 254 F.3d 1180, 1188 n. 1 (10th Cir.2001) (en banc). "[T]he allegations must be specific and particularized, not general or conclusory." *Id*. Courts will not "sift through the case's voluminous record to find support for the defendant's claims." *United States v. Apperson*, 441 F.3d 1162, 1204

(10th Cir. 2006) (citation omitted).

### 3. *Alleged Claim of False Diagnosis.*

Defendant states "[i]n psychological report by Dr. DiMisa, she confirm [sic] That [sic] my Attorney [sic] is working Against [sic] me And [sic] wanted her to File [sic] A False [sic] diagnosis (see report)." (*Motion*, Doc. #372, at 7).

Defendant appears to be referring to the medical evaluation ordered by the Court to determine his competency to stand trial. (*Sealed Medical Evaluation*, Doc. #79). Defendant does not identify which portion of the 28-page evaluation shows his attorney was working against him. Nor is it clear what diagnosis Defendant believed was assigned to him or how it was false. Regardless, the report determined Defendant was competent to stand trial, which this Court also validated. (*Id.*; *Minute Sheet – Competency Hearing*, Doc. # 93; *Order*, Doc. #94).

### 4. *Alleged Violation of the Attorney Client Privilege.*

Next, Defendant claims "Attorney violated Attorney [sic] client privledge [sic] At [sic] sentencing." (*Motion*, Doc. #372, at 6, 11). He also vaguely references an attorney "being investigated by the Utah Office of Professional Conduct At [sic] the request of the Judge: OPC File 23-0265 For Not Filing A Writ of Certiori [sic]." (*Id.*, at 7). Defendant has failed to attach, document, or specify what conduct violated the attorney client privilege or to validate the OPC investigation.[6] Generally, courts will not consider conclusory allegations not substantiated with factual and legal support. It is Defendant's burden to "allege facts which, if prove[n], would entitle

---

[6] A review of the "Attorney/LPP Public Discipline PDF" took place, which was found on the Utah Office of Professional Conduct website. https://www.opcutah.org/wp-content/uploads/2023/11/Attorney_Public_Disciplin_OPC_Master_Nov_23.pdf (Last accessed November 27, 2023). The document includes discipline summaries from 1988 to the date of the most recent Utah Bar Journal, which was the November 2023 volume. A review did not yield any discipline results for Robert Williams, Warren Gotcher, or Barry Derryberry.

him to relief." *Hatch v. Oklahoma*, 58 F.3d 1447, 1471 (10th Cir.1995), overruled in part on other

grounds by *Daniels v. United States*, 254 F.3d 1180, 1188 n. 1 (10th Cir.2001) (en banc). "[T]he

allegations must be specific and particularized, not general or conclusory." *Id.*

### 5. *Alleged Withholding of Evidence.*

Finally, Defendant attempts to relitigate his kidnapping conviction (which has since been

reversed on appeal) under the guise of ineffective assistance of counsel. He claims specifically:

- "Attorney had overwhelming evidence that the victim had stolen from Piette, had traveled Freely [sic] back and Forth Across [sic] the Mexican border Alone At [sic] the same time that she claimed she was being held captive by Piette." (*Motion*, Do. #372, at 9);

- Defense attorney had proof that the victim had stolen over $9,000 from Piette's U.S. Direct debit card And [sic] done so At [sic] the same time she claimed to be held captive. Yet, he Failed [sic] to present this evidence to the jury." (*Id.*).;

- "He also Failed [sic] to present the proof that the victim was held in U.S. custody in Federal holding and charged w/ human trafficking [sic] At [sic] the same time she claimed to be held captive." (*Id.*).;

- "Lawyer supressed [sic] Fact [sic] that the victim was granted A [sic] legal name change in Utah, then charged w/ A [sic] crime, Fled [sic] to Mexico And [sic] later returned to the U.S. under her old name." (*Id.*).;

- "[O]n the day that victim claimed to have escaped captivity And [sic] left Piette 'At home drunk on A couch', Piette was in prison in Mexico And [sic] had been for 3 months." (Id., at 10).; and

- "Defense Attorney was Aware [sic] of All [sic] the Above And [sic] had victim's NCIC reports under different names, multiple Arrests [sic], Piette's prison record w/ dates, proof that the victim was never held captive but Failed [sic] to present Any [sic] of this to the jury." (*Id.*).

These assertions are contrary to the record and without merit.

Prior to trial, Mr. Gotcher filed a "Notice of Introduction of NCIS Report and Expert

20

Witness", wherein he argued for the submission of McGinnis' NCIS report at trial and offered an

expert witness to testify as to what NCIC contacts are and what they show.  (*Notice*, Doc. #161).

Mr. Gotcher argued the evidence was necessary for the defense and would be in the interest of

justice.  (*Id*.).

Also, in a pretrial application to issue subpoenas, Mr. Gotcher requested to call a number

of witnesses that would testify McGinnis was a con artist, a criminal, and was never being held

against her will.  (*Application*, Doc. #131).

In his trial brief, Mr. Gotcher argued for the inclusion of the following evidence:

1. Sherman, Texas. Arrest records showing Henri Piette is in jail
   and could not make bond to begin his incarceration and had to
   bail out after his initial incarceration.

2. Nogales, Ariz. Child protective services records concerning the
   children of the Defendant. Occurred 04/27/12 when mother was
   arrested for smuggling aliens across the border.

3. Wagoner, Oklahoma, DHS records where Rosalyn McGinnis
   does not want to go with her mother. Further releases allowing
   the Defendant to seek medical care for Rosalyn.

4. Navaho County, New Mexico arrest records wherein she states
   they were separated.

5. Cleveland County, Oklahoma certified court or public record
   where the Defendant is bonded out of jail by Rosalyn/Stephanie
   in 2007.

(*Trial Brief*, Doc. #162, at 2).

Following the jury trial, Mr. Gotcher filed a motion for variance, seeking leniency for

Defendant as follows:

> That the Defendant standing before this court certainly is a man that
> the evidence shows had a situation that the victim could have
> terminated at any time within the last ten years or so. That the victim
> had the Defendant arrested and bonded the Defendant out of jail
> after the Defendant had been arrested other times. The victim had

21

> possession of firearms during this time period. That the guidelines
> call for a sentence of life. That this court should consider this mans
> age and health, and craft a sentence with leniency.

(*Motion for Variance*, Doc. #218).

The record in this case establishes counsel acted in a reasonably professional manner and did not provide ineffective assistance of counsel pursuant to *Strickland*.

### III. THE COURT MAY PROPERLY OVERRULE DEFENDANT'S MOTION WITHOUT AN EVIDENTIARY HEARING.

Pursuant to 28 U.S.C. §2255(b), the Court is required to hold an evidentiary hearing "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." However, in this case no additional hearing is necessary to dispose of Defendant's claims. The Court already has a well-developed record, including transcripts and a prior appeal, which provide a factual background upon which to evaluate Defendant's claims. The files and records of the case and the authorities cited conclusively show Defendant is entitled to no relief and an evidentiary hearing would serve no purpose, nor would the denial of an evidentiary hearing be an abuse of discretion. *United States v. Barboa*, 777 F.2d 1420, 1422, n. 2 (10th Cir. 1985). Accordingly, the Court may properly deny Defendant's motion without first holding a hearing.

### CONCLUSION

For the foregoing reasons, the Government respectfully requests the Court dismiss Defendant's Motion.

Respectfully submitted,

CHRISTOPHER J. WILSON
Acting United States Attorney

*/s/ Linda A. Epperley*
Linda A. Epperley, OBA No. 12057
Assistant United States Attorney
520 Denison Avenue
Muskogee, Oklahoma 74401
Telephone: (918) 684-5156
Facsimile: (918) 684-5150
linda.epperley@usdoj.gov

## CERTIFICATE OF ECF FILING & SERVICE

I hereby certify that on November 27, 2023, I electronically transmitted the attached documents to the Clerk of Court for the Eastern District of Oklahoma using its CM/ECF System for filing. An electronic copy was sent to counsel for Defendant via the ECF systems:

Mr. Mke Abel       abel.law@yahoo.com

*/s/ Linda A. Epperley*